**TARTER KRINSKY & DROGIN LLP**
Juan Olivo-Castro (Bar No. 370322021)
1350 Broadway
New York, New York 10018
Tel.: (212) 574-0329
Email: jolivo@tarterkrinsky.com

*Attorneys for Plaintiff EmblemHealth, Inc.*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| EMBLEMHEALTH, INC., <br><br> Plaintiff, <br><br> -against- <br><br> NORMAN M. ROWE, M.D., NORMAN M. ROWE, M.D. PLLC, NORMAN M ROWE MD OF NEW JERSEY LLC, ROWE PLASTIC SURGERY OF NEW JERSEY LLC, and EAST COAST PLASTIC SURGERY PLLC PA, <br><br> Defendant(s). | Case No. 26-cv-3311 <br><br><br> **COMPLAINT** |

Plaintiff EmblemHealth, Inc. ("Emblem" or "Plaintiff"), by and through its undersigned counsel, Tarter Krinsky & Drogin LLP, as and for its Complaint ("Complaint") against Defendants Norman M. Rowe, M.D. ("Dr. Rowe"), Norman M. Rowe, M.D. PLLC ("Rowe PLLC"), Norman M Rowe MD of New Jersey LLC ("Rowe of NJ"), Rowe Plastic Surgery of New Jersey LLC ("Rowe PS of NJ"), and East Coast Plastic Surgery PLLC PA ("East Coast"), (collectively "Defendants" or "Rowe"), alleges as follows:

**INTRODUCTION**

1.      This action graphically illustrates how a statute that was intended to reduce the costs of treating with out-of-network providers has been turned completely on its head so that

Rowe is being awarded $440,000 for performing a routine breast reduction for which he has historically been paid and accepted between approximately $6,000 to $30,000 by Emblem.

2.      Rowe perform breast reduction surgery. By choice, they do not participate in any of Emblem's provider networks. As discussed below, Rowe have been awarded completely irrational amounts in proceedings under the Federal No Surprise Act, 42 U.S.C. §§ 300gg-111 – 139 ("NSA"), where they have fraudulently misrepresented to Independent Dispute Resolution Entities ("IDREs"), among other things, that the cost of a routine breast reduction is $600,000.

3.      Rowe's "billed charge" of $600,000 for a breast reduction – *i.e.*, $300,000 each for the primary and assistant surgeons – is a fictitious, non-market-based charge that bears no relationship to the amount they have regularly accepted from Emblem, other insurers and self-pay patients.

4.      Based upon Rowe's fraudulent claims and misrepresentations of the facts, the IDREs have awarded as much as $440,000 to Rowe – *i.e.*, $220,000 each for the primary and assistant surgeons – with absolutely no explanation as to how a breast reduction could possibly cost so much.

5.      Nor have the IDREs explained how the assistant surgeon could possibly be paid the same fee as the primary surgeon, especially when the standard rate is 16% of the primary surgeon's fee according to guidelines from the Centers for Medicare & Medicaid Services ("CMS") and Emblem's own policy.

6.      To illustrate the complete and utter irrationality of the IDREs awards, Rowe's own website informs patients that they ***"can expect to pay on average, anywhere from $15,000 to $25,000 for your breast reduction surgery."*** (https://normanrowemd.com/how-much-does-breast-reduction-surgery-cost-a-detailed-look/) (emphasis added) (last visited on March 18, 2026.)

- 2 -

7.      Having figured out that they can misuse NSA Independent Dispute Resolution proceedings ("IDR Proceeding") to obtain completely irrational awards, to date Rowe have filed over 100 IDR Proceedings against Emblem and obtained millions in awards.

8.      The intent of the NSA was to bring out-of-network medical costs roughly in line with average in-network contract rates, not dramatically increase the amounts paid to out-of-network providers so that they bear absolutely no relationship to the market based cost. It is the healthcare system and insureds who will inevitably bear the brunt of irrational IDR awards in the form of increased premiums.

9.      The breast reduction surgeries at issue were not performed on an emergency basis where the patients did not know that Rowe was an out-of-network provider or were deprived of the choice of using an in-network provider. The elective surgeries were pre-scheduled long before they took place, and the patients were fully aware that Rowe did not participate in Emblem's networks.

10.      In substantially all of the cases, the Emblem-insured patients Rowe treated were enrolled in the GHI Comprehensive Benefits Plan for City of New York Employees and Retirees (the "NYC PPO Plan"), a plan which included out-of-network benefits that covered them for treating with Rowe.

11.      Prior to the effective date of the NSA, Rowe performed hundreds of breast reduction procedures on Emblem NYC PPO Plan members and were paid the applicable out-of-network benefit of under $10,000 under the NYC PPO Plan. Rowe accepted this payment and, upon information and belief, did not balance bill the patients for the difference between the applicable benefit amount under the NYC PPO Plan and Rowe's fictitious "billed charge." In over one-hundred and fifty (150) cases, Rowe and Emblem entered into Single Case Agreements

("SCAs") in which they agreed to payment of $25,500 for the primary surgeon and/or $4,080 for the assistant surgeon (*i.e.*, 16% of the surgeon's fee of $25,500).

12.     Following passage of the NSA, however, Rowe came up with a plan to defraud Emblem and corrupt the NSA. Rowe determined that if they performed the breast reduction procedure on a NYC PPO Plan member at an Emblem in-network facility or hospital, they could nullify the applicable benefit under the NYC PPO Plan.

13.     As part of their fraudulent scheme, after scheduling the procedure long-in advance, upon information and belief Rowe failed to obtain the applicable NSA Notice and Consent Form from the patients, failed to disclose to the patients (or misrepresented) that they do not pursue recovery of the balance of their bill not paid by Emblem, and then filed an IDR Proceeding seeking an award in excess of 600% of the NYC PPO Plan's out-of-network benefit in which they misrepresented the facts allegedly supporting the irrational amount sought to the IDREs.

14.     To graphically highlight the complete irrationality of the IDRE awards, assume that Rowe perform several hundred breast reductions per year – three hundred (300) to be conservative – and were paid the $440,000 recently awarded; the payments to Rowe for just a single year would total an astounding $132 million!

15.     Before misusing the NSA, Rowe was a serial filer of lawsuits against insurers demanding wildly exorbitant amounts when they treated insureds out-of-network. Those actions were dismissed by the courts on a host of grounds. In threatening to impose sanctions on Rowe, a federal court judge in New York commented on the "numerous cases brought by plastic surgeon Norman Rowe against various insurers" based on ***"Rowe's exorbitant fees for plastic surgery he performed as an out-of-network provider."*** *Rowe v. Aetna Life Ins. Co.*, No. 23-civ-8527, 2025

WL 692051, at *1 (S.D.N.Y. Mar. 3, 2025) (denying leave to amend and dismissing two cases with prejudice) (emphasis added).

16.     Because the IDR awards were obtained by Rowe through fraud and are completely irrational, among other things, Emblem is entitled to a judgment declaring them unenforceable.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under federal law, including the NSA, 42 U.S.C. §§ 300gg-111 – 139. The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

18.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

**A.     Plaintiff**

19.     Emblem is a not-for-profit corporation organized and existing under the laws of the State of New York with its principal place of business located at 55 Water Street, New York, New York.

**B.     Defendants**

20.     Dr. Rowe is a plastic surgeon who, through multiple entities, provides plastic surgery and related services, including breast reductions, to patients residing in New York, New Jersey, and Florida.

21.     Upon information and belief, Defendants Rowe of NJ, and Rowe PS of NJ are each a New Jersey limited liability company with a principal place of business located at 89 Valley Road, Montclair, New Jersey 07042. Upon information and belief, Defendant Rowe PLLC is a New York professional services limited liability company with its principal place of business

- 5 -

located at 820 Park Avenue, Suite 1B, New York, NY 10021. Upon information and belief, Defendant East Coast is a New Jersey limited liability company with its principal place of business located at 267 Broad Street, Red Bank, New Jersey 07701. Upon information and belief, Dr. Rowe owns, manages, operates and controls each of these entities.

22.     Through Rowe PLLC, Rowe of NJ, Rowe PS of NJ, East Coast, and other entities situated across three states,[1] Dr. Rowe runs a surgical mill doing hundreds of breast reductions per year.

23.     Rowe's billboards appear on major highways and roads throughout New York and New Jersey.



---

[1]     Rowe's websites boast seven (7) locations in Manhattan (820 Park Avenue), Montclair, NJ (89 Valley Road), Red Bank, NJ (267 Broad Street), Vorhees, NJ (701 White Horse Road), Palm Beach, FL (175 Bradley Place), Plainview, Long Island (100 Manetto Hill Road), and the Hamptons, Long Island (760 Montauk Highway).

Online, Dr. Rowe goes by the nickname of "Dr. Penis™" to advertise his male enhancement services. *See* https://normanrowemd.com/procedures/body/non-invasive-penis-enlargement/ (last visited on March 20, 2026).

24.     As Dr. Rowe himself publicly states in a video uploaded to YouTube that is also available on at least one of their websites[2], breast reduction surgery is a "very common" and "routine" procedure, representing "one of the top ten procedures performed by plastic surgeons in the United States." Rowe's website informs prospective patients that having a breast reduction done at a private practice's own ambulatory surgery center minimizes the fees because "[h]ospitals usually charge more if you have to use them."[3]

25.     Upon information and belief, Dr. Rowe and the other plastic surgeons affiliated with Rowe can perform breast reduction surgeries at out-of-network Ambulatory Surgical Centers ("ASCs") located in New York and New Jersey.

26.     For example, under the heading "On-Site Surgical Center," Rowe's website represents that their "office has a fully accredited operating room and recovery room" and that they are "able to perform most, if not all, procedures" in the "comfort, privacy and confidentiality" of their certified "private" operating room. A true and correct screenshot of this page of Rowe's website is reproduced below:

---

[2]      https://youtu.be/my4HofiQC60?si=7SpYQmm9_NbRBRA2 (last visited March 18, 2026).

[3]      https://normanrowemd.com/how-much-does-breast-reduction-surgery-cost-a-detailed-look/ (last visited March 18, 2026).



27.    In addition to their own "fully-accredited operating room and recovery room," Rowe's website represents that they participate in the "Center for Specialty Care," which they describe as "the first ambulatory surgical center containing multiple practices licensed by the New York State Health Department."

**C.    Rowe's Scheduling of Breast Reduction**
**Surgeries At In-Network Hospitals**

28.    If Rowe performed breast reduction procedures on Emblem insureds at any out-of-network ASC, the procedures would not fall under the NSA or be eligible for the NSA's IDR process. Accordingly, notwithstanding that Rowe's own website informs patients that the cost of a breast reduction will be higher if performed at a hospital, Rowe perform routine, pre-scheduled breast reductions at in-network hospitals so they can take advantage of and misuse the NSA.

29.    As part of their fraudulent scheme to abuse the NSA's IDR process, Rowe schedules breast reduction surgeries in New Jersey at facilities that participate in Emblem's plans, including

Hudson Regional Hospital ("Hudson Hospital"), located at 55 Meadowlands Parkway in Secaucus, New Jersey.

30.     By pre-scheduling an out-of-network breast reduction at an in-network hospital, Rowe thereby manufactures a purported basis to gain access to the NSA's IDR process where, because of the absence of any of the ordinary protections in court proceedings or commercial arbitrations, including disclosure, cross-examination and a hearing, Rowe are able to defraud Emblem and the IDREs.

31.     Emblem brings this action to protect itself and its subscribers from Rowe's fraudulent misuse of the NSA's IDR process.

## FACTUAL BACKGROUND

**I.     Emblem Issues And Administers Health
Insurance Plans, Including The NYC PPO Plan**

32.     Through its wholly-owned subsidiaries and affiliates, Emblem administers health insurance plans, including, but not limited to, the NYC PPO Plan.

33.     The NYC PPO Plan provides both in-network and out-of-network benefits to New York City employees, retirees and their covered dependents.  The out-of-network benefits are set at rates critical to maintaining affordable premiums for the City of New York and NYC PPO Plan members.

34.     The out-of-network benefit under the NYC PPO Plan varies depending on whether the insured is covered by certain riders and their applicable deductible and copayment. Although it varies based upon the foregoing, the benefit for a bilateral breast reduction performed by an out-of-network provider is under $10,000.

35.     When NYC PPO Plan members pre-schedule breast reduction surgeries with Rowe, they are covered for the out-of-network services Rowe provides. In fact, both Rowe and the NYC

PPO Plan members know the amount of the benefits that will be reimbursed to the plan member (and paid to Rowe) under the NYC PPO Plan. This allows plan members to decide whether to have the surgery performed by Rowe instead of by one of the numerous in-network plastic surgeons.

36.     The patients discussed below, each of whom have received bilateral breast reduction surgery from Rowe, were enrolled in the NYC PPO Plan at the time their procedures were performed.

## II.     The Federal No Surprises Act

### A.     The NSA Was Enacted To Curb Abusive Billing Practices By Out-Of-Network Providers

37.     Health plans like Emblem contract with a network of health care providers, including hospitals and physicians, from whom their members may obtain "in-network" care. Such contracts govern the rate for the relevant services and prohibit the participating providers from billing the patients directly for the difference between the contract rate and their billed charges (*i.e.*, balance billing). Generally, patients receive more affordable health care coverage when receiving treatment from in-network providers.

38.     Patients can also choose to obtain treatment from out-of-network providers, who have no contract with their health plan. Because out-of-network providers are not bound by contractual billing limitations, patients typically pay more when they elect to receive care from out-of-network providers.

39.     There are situations, however, in which a patient has no ability to choose between in- and out-of-network care. One example is when a patient is suffering from a medical emergency and receives treatment at the emergency room, where the on-call physician may not be in the patient's health plan's network.

40. Another example is when a patient visits an in-network hospital to be treated by an in-network physician, such as a surgeon, but ***unknowingly*** also receives treatment from an out-of-network physician, such as an anesthesiologist, radiologist, or some other ancillary service provider. In these "[s]ituations . . . [the] patients have little or no control over whether a provider is in or out-of-network [.]"  H.R. Rep. 116-615, at 51.

41. None of the situations that the NSA was intended to address are at issue when Rowe performs an elective, pre-scheduled breast reduction on a NYC PPO Plan member. In these situations, the Emblem member/Rowe's patient has chosen to voluntarily incur the potential additional financial cost of using an out-of-network provider.

42. Prior to the enactment of the NSA, out-of-network providers often engaged in the aggressive and financially devastating practice of "surprise billing." Specifically, the providers would exploit patients' inability to choose an in-network provider and bill the patient for the difference between their inflated, non-market-based rates — known as "billed charges" — and the amounts paid by health plans. H.R. Rep. No. 116-615 (2020), at 53, 57.

43. Surprise billing providers held "substantial market power."  They were able to "charge amounts for their services that ... result[ed] in compensation far above what is needed to sustain their practice" because they "face highly inelastic demands for their services because patients lack the ability to meaningfully choose or refuse care." *Id.* at 53.

44. Surprise billing providers reaped massive profits by issuing surprise medical bills to patients and had little incentive to contract with health plans to offer more affordable health care services to American consumers.

45.    Congress characterized this framework as a "market failure" that was having "devastating financial impacts on Americans and their ability to afford needed health care." *Id.* at 52.

46.    In response to such abuses, Congress enacted the NSA.

47.    In enacting the NSA, Congress had dual purposes firmly in mind.

48.    *First*, Congress sought to eliminate "surprise" medical billing to patients by ensuring that certain out-of-network providers are treated the same as in-network providers. To this end, the NSA provides that patients shall bear no more financial obligation to an out-of-network provider for a "surprise" bill than the patient would if the service had been rendered by an in-network provider (*i.e.*, the patient is responsible for any deductible, co-insurance, and/or copay to the same extent as he or she would be for an in-network service, and nothing more). 42 U.S.C. §§ 300gg-111(b)(1).

49.    *Second*, having removed the patient from the payment discussion, Congress designed a dispute resolution process that was intended to afford out-of-network providers and insurers the opportunity to negotiate a reasonable payment amount for the provider's services.

50.    Effective January 1, 2022, the NSA banned surprise billing for three categories of out-of-network care: (1) emergency services; (2) non-emergency services by out-of-network providers at in-network facilities; and (3) air ambulance services. *See* 42 U.S.C. §§ 300gg-131, 300gg-132, and 300gg-135. To be subject to the NSA and IDR, healthcare services must fall into one of these three categories (and meet other statutory and regulatory requirements).

51.    Because the NSA seeks to address surprise billing, Congress provided a mechanism for patients and out-of-network providers to opt out of the NSA where the patient knowingly elects to receive non-emergency services from an out-of-network provider.

52.     Specifically, Section 132(d) of the NSA provides that an out-of-network provider can provide the patient, at least 72 hours in advance of the date on which the non-emergency services are rendered, a copy of a written notice and consent form promulgated by the Secretary of Health and Human Services ("NSA Notice And Consent Form"), to:

    a.    inform the patient that the provider is out-of-network with respect to the patient's insurance plan;

    b.    provide the patient with a good faith estimate of the out-of-network provider's charges for the services at issue;

    c.    if the services are to be provided by an out-of-network provider at an in-network facility, a list of the participating providers at that in network facility who are able to furnish the services on an in-network basis; and

    d.    provide the patient with information about whether prior authorization is required in advance of receiving the services in question.

42 U.S.C. § 300gg-132(d).

53.     Rowe could have provided and obtained a NSA Notice and Consent Form from every Emblem insured on whom they performed a breast reduction procedure. Upon information and belief, because doing so would have prevented them from pursuing their fraudulent scheme, Rowe either did not provide the form to their Emblem patients or mislead the patients not to sign it by misrepresenting that if they did sign the Form, Rowe could balance bill them for the difference between their billed charges and the amount paid by Emblem and/or by omitting to inform the patients that Rowe had no intention of balance billing them.

**B.      The IDRE Process**

54.      Because the NSA seeks to "comprehensively protect consumers by 'taking [them] out of the middle' of surprise billing disputes," H.R. Rep. No. 116-615, at 55, it was necessary for the NSA to create a separate framework outside the judicial process for health plans and providers to resolve specific types of eligible surprise billing disputes. *See* 42 U.S.C. § 300gg-111(c).

55.      The framework consists of (1) open negotiations (a required 30-business-day period to try resolving the dispute informally); (2) an IDR process if no agreement is reached through negotiation; and (3) if applicable, a payment determination from a private IDRE.

56.      When a health plan receives a claim for out-of-network services subject to the NSA, the health plan must make an initial payment or issue a notice of denial of payment within 30 days. *See* 42 U.S.C. § 300gg-111(a)(1)(C)(iv)(I).

57.      If the provider is dissatisfied with the initial payment, it may initiate open negotiations with the health plan by providing formal written notice to the health plan within thirty (30) business days of the initial payment or notice of denial ("Open Negotiation Period"). 42 U.S.C. § 300gg-111(c)(1)(A).

58.      After initiating open negotiations, the provider must attempt in good faith to negotiate a resolution with the health plan during the Open Negotiation Period. *See id.*

59.      If "the open negotiations . . . do not result in a determination of an amount of payment for [the] item or service," the provider may initiate the IDR process. *See* 42 U.S.C. § 300gg-111(c)(1)(B); 45 C.F.R. § 149.510(b)(2)(i).

60.      The IDR process is available only to those providers who first initiate and exhaust open negotiations with the health plan. *See id.* Providers must initiate the IDR process within four (4) business days after the Open Negotiations Period has been exhausted. *See id.*

61.      The Open Negotiations Period is a central requirement of the IDR process. Congress explained that one of the primary purposes of the NSA was to ensure that health care providers (including

surgeons such as Rowe), and payors (including private insurance companies like Emblem), are incentivized to resolve their differences amongst themselves. *See* Brady Opening Statement at Full Committee Markup of Health Legislation (Feb. 12, 2020), available at https://waysandmeans.house.gov/2020/02/12/brady-opening-statement-at-full-committee-markup-of-health-legislation-3/.

62.    Further, the IDR process is available only for a "qualified IDR item or service" eligible for the process. 42 U.S.C. § 300gg-111(c)(1); 45 C.F.R. § 149.510(a)(2)(xi), (b)(1), (b)(2). To be considered a qualified IDR item or service within the scope of the IDR process, all of the following conditions must be met:

a.   The underlying service is within the NSA's scope;

b.   A state surprise billing law (referred to as a "specified state law") does not apply to the dispute;

c.   The underlying service was covered by the patient's health benefit plan (i.*e.,* the claim was not denied);

d.   The patient did not opt out of the NSA's balance billing protections pursuant to the NSA Notice and Consent Form;

e.   The provider timely initiated and exhausted open negotiations;

f.   The provider timely initiated the IDR process within four (4) business days after the close of the Open Negotiations Period; and

g.   The provider has not had a previous IDR determination on the same or similar service and against the same payor in the previous 90 calendar days.

42 U.S.C. § 300gg-111(c)(1)(B); 45 C.F.R. §§ 149.510(a)(2)(xi), (b)(2).

63.     Providers initiate the IDR process through a Federal website called the IDR Portal. *See* https://nsa-idr.cms.gov/paymentdisputes/s/.  When initiating the NSA's IDR process, providers must, among other things, submit an attestation that the items and services in dispute are qualified IDR items or services within the scope of the IDR process. *See* 45 C.F.R. § 149.510(b)(2)(iii)(A)(6); *see also* Notice of IDR Initiation Form, U.S. Dept of Labor, available at https://www.dol.gov/sites/dolgov/files/ebsa/laws-and-regulations/laws/no-surprises-act/notice-of-idr-initiation.pdf.

64.     A copy of the IDR initiation form, including the attestation, is provided to the non-initiating party, the IDRE, and the Departments of Health and Human Services ("HHS"), Labor ("DOL"), and Treasury (collectively, the "Departments").

65.     After successfully completing the Qualification Questions, the initiating party is asked to complete the Notice of IDR Initiation. The initiating party must provide a variety of relevant information, including the name and contact information of the health care provider, the claim number, the date of the service, and the "Qualified Payment Amount" ("QPA") for the item or services at issue. The QPA is roughly the median rates that the insurer is paying in-network providers for the same services in the same geographic area, along with documentation supporting these facts.

66.     At the end of this process, the submitting party must attest, via electronic signature, that the "item(s) and/or service(s) at issue are qualified item(s) and/or services(s) within the scope of the Federal IDR process."

67.     After the IDR process is initiated, the parties select, or HHS appoints, an IDRE. 42 U.S.C. § 300gg-111(c)(4)(F). IDREs are private entities who apply to become certified to conduct IDR Proceedings.

68.     The provider and health plan each submit an offer (along with supporting information) and the IDRE selects one party's offer as the out-of-network rate. 42 U.S.C. § 300gg-111(c)(5)(B).

69.     The submissions to the IDRE are made on an *ex parte* basis so that neither side sees the other side's submission, much less has the opportunity to rebut or address any misleading or inaccurate information therein. As such, it is a process literally rife for fraud.

**C.     The NSA Was Established To Achieve Reasonable Compensation For Out-Of-Network Providers Roughly Approximating Average In-Network Rates**

70.     To fully drive home its goal to curb out-of-network providers' inflated and fictitious "billed charges," the NSA expressly states that a provider's "billed charge" ***may not be considered*** by an IDRE in accepting either of the two competing offers. 42 U.S.C. § 300gg-111(c)(5)(D). Congress reasoned that permitting IDREs to even "consider non-market-based rates such as the providers' billed charges" would "drive up consumer costs." H.R. Rep. No. 116-615, at 57.

71.     Rather, the NSA and its implementing Rules limit the IDRE's consideration to the QPA and five additional considerations: (a) the provider's level of training, experience and quality outcomes measurements, (b) the provider's market share, (c) patient acuity, (d) the provider's teaching status, case mix and scope of services, and (e) any demonstrations of good faith efforts (or lack thereof) by the provider to enter into a network agreement with the private insurer. § 300gg-111(c)(5)(C).

72.     Congress' intent with respect to the importance of the QPA (and its abhorrence for IDREs considering or awarding providers their "billed charges") is clear.  It was Congress' "intent and . . . determination that the QPA, which reflects standard market rates arrived at through private contract negotiations, represents a reasonable rate for serves in a vast majority of cases," and should "serve as a predominate data point for the IDR entity to consider." *See* October 20, 2021

Letter from Frank Pallone, Jr. (Chairman, Senate Committee on Energy and Commers) and Patty Murray (Chair, House Health, Education, Labor, and Pensions committee) to Secretaries of the U.S. Departments of Health and Human Services, Treasury, and Labor ("October 20, 2021 Pallone and Murray Letter").[4]

73.    Additionally, the NSA's statutory prohibition against an IDRE considering billed charges, coupled with its mandate "that the results of IDR determinations be reported as a *percentage of the QPA*" and that the Secretary of DHS "report on the number of times the payment determined exceeds the QPA" further "signal[s] Congress' interest in knowing how significantly determinations vary from reasonable market rates." (*Id.* (emphasis added).)

74.    Simply put, "these statutory elements reflect the importance the [NSA] assigns to the QPA in the Federal IDR process, and show that the statute contemplates that typically the QPA will be a reasonable out-of-network rate." *Id.*

75.    Not less than thirty (30) business days after selection of the IDRE, the IDRE must select the offer that it determines "best represents the value of the qualified IDR item or service as the out-of-network rate."  45 CFR 149.510(c)(4)(ii)(A). The IDRE must "explain its determination in a written decision" which must include an explanation of "what information the certified IDR entity determined demonstrated that the offer selected . . . is the offer that best represents the value of the . . . service, including the weight given to the qualifying payment amount and any additional credible information under paragraphs (c)(4)(iii)(B) through (D) . . . includ[ing] an explanation of why the certified IDR entity concluded that this information was not already reflected in the qualifying payment amount."

---

[4]        Available at: Pallone Murray No Surprises Act IFR Comment Ltr 10.20.212.pdf.

76.     For the most part, IDREs issue decisions made by an unidentified person that contain little or no explanation. Even where they indicate which statutory factors were considered, the decisions – like those discussed below – generally do not explain why or how those factors support the offer chosen, let alone why the amount chosen represented the best value for the services rendered. *See generally No Surprises Act Arbitrations Vary Significantly in Their Decision Making Patterns*, GEORGETOWN UNIV. CENTER ON HEALT INS. REFORMS, available at No Surprises Act Arbitrators Vary Significantly In Their Decision Making Patterns | Center on Health Insurance Reforms.

77.     Importantly, under the NSA, an IDR award is not "binding" where, as here, it is based on a fraudulent claim or was procured through a misrepresentation of the facts presented to the IDRE. 42 U.S.C. § 300gg-111(c)(5)(E)(i)(I).

78.     In addition, an IDR award can be vacated under the NSA, which incorporates Paragraphs 1 through 4 of Section 10(a) of the Federal Arbitration Act ("FAA"). *Id.* at § 300gg-111(c)(5)(E)(i)(II).

79.     Of course, if an award is not binding under § 300gg-111(c)(5)(E)(i)(I), it is not enforceable regardless of whether it is vacated.

**D.     Rowe Has Systematically Abused The NSA's IDR Process**

80.     In the regulations establishing the IDR process, the Departments estimated that the process would annually resolve 17,333 disputes, with an additional 4,899 disputes from air ambulance providers. This estimate reflected expectations that most disputes would be resolved amicably through the mandatory 30-day negotiation period before the IDR.

81.     The reality has been far different.

82.     From mid-2022 to May 2025, *3,324,051* disputes were filed (including air ambulance disputes). In the nine months after the system opened in 2022, about 190,000 disputes

were filed – more than ten times the number expected for the first full year alone. *See* "The Substantial Costs Of The No Surprises Act Arbitration Process," Jack Hoadley and Kennah Watts, Center on Health Insurance Reforms, August 25, 2025.[5]

83.     Over that same period, 2,831,804 disputes were closed. Of those closed disputes, 2,152,045 payment determinations were issued by IDREs. Notably, this count underestimates the total number of line-item claims that have received an IDR decision because many claims were filed in batch. *Id.*

84.     Providers have won the vast majority of disputes. In 2024, providers won eighty-five percent (85%) of the line-item claims decided that year, up from eighty-one percent (81%) in 2023. *Id*.

85.     Furthermore, providers have won substantial offer amounts. In the first quarter of 2024, for line-items where the provider prevailed, the median payment determination was four hundred fifty-nine percent (459%) of the QPA. That means the provider requested, and won, a payment that was over four times the prevailing in-network amount. *Id.*

86.     The median payment determination amount has increased over time. The median award amounts in 2023 and 2024, for line-item disputes won by providers, were three hundred twenty-seven percent (327%) and four hundred forty-five percent (445%) percent of the QPA, respectively. Often, the winning amounts are even higher. *Id.*

87.     Commentators have observed that the alarming high provider win rates, and the magnitude of exorbitant awards to providers far exceeding reasonable in network rates, "continue to defy expectations." *Id.*

---

[5]     Available at https://www.healthaffairs.org/content/forefront/substantial-costs-no-surprises-act-arbitration-process.

88.     Commentators have also warned that, "without action to rethink the IDR process," or judicial intervention such as that sought by Emblem in this action, "the high costs will add to overall health system costs and will ultimately be paid by consumers." *Id.*

89.     These data starkly illustrate how providers have seized upon the NSA to "flood the zone" with a barrage of IDRs so as to overwhelm private insurer payors and the IDREs who must respond to the onslaught.

90.     Because the information submitted by providers is not subject to scrutiny to ensure that providers are supplying IDREs with credible and accurate information, providers have been able to abuse the NSA's IDR process as a means to tilt the playing field in their favor.

91.     Not surprisingly, the result has been that providers, like Rowe, have been able to extract exorbitant awards, often close to, at or in excess of their fictitious billed charges, that profoundly exceed the fair and reasonable value of their services.

92.     Even the federal legislators who sponsored the NSA have expressed concerns.

93.     In a letter dated January 7, 2022 to the Secretary of Health and Human Services, Senator Patty Murphy (Chair of the Senate Committee on Health, Education, Labor, and Pensions) and Representative Frank Pallone, Jr. (Chairman of the House Energy and Commerce Committee) reiterated that "Congressional intent [in enacting the NSA was] to ensure that the law *lowers* health care costs." (Emphasis added.)   Senator Murphy and Representative Pallone were among the Congressional legislators who championed bills and initiatives that ultimately coalesced into the NSA.

94.     In their January 22, 2022 letter, they stressed that Congress did not intend for the NSA's "IDR process to pass higher costs on to individuals in the form of increases in premiums." (Internal quotations omitted.)

95.   They further explained that "every bill considered by the [Senate and House] committees [that considered legislation which ultimately became part of the NSA] included the QPA as the primary rate that IDR entities should consider when making decisions. Each resulted in significant savings to the Federal government through reduced health insurance premiums, due to the requirement that the IDR entity consider the QPA."[6] *Id* at 4.

96.   They likewise cautioned that "Allowing IDR entities to consider other factors when they are *not backed by credible evidence* would serve only to increase health care costs and undermine the integrity of the process. As such, requiring IDRE's to consider factors when parties offer no credible evidence to support that the QPA is not the appropriate out-of-network payment rate is the policy that would contradict Congressional intent." *Id.* at 1 (emphasis added).

97.   Finally, they emphatically stated that "Any policy that increases the cost of care without providing information to an IDR entity *that withstands critical analysis* would be inconsistent with Congressional intent." *Id.* at 5 (emphasis added).

98.   For the same reasons, the submission of outright false and misleading information by a provider to an IDRE, and the IDRE's reliance on such information to support an award to the provider that is orders of magnitude above the QPA, similarly contradicts Congressional intent by legitimizing out-of-network providers' inflated charges.

---

[6]   *See* Congressional Budget Office, H.R. 5826, Consumer Protections Against Surprise Medical Bills Act of 2020, as Introduced on February 10, 2020 Estimated Budgetary Effects (Feb. 10, 2020) ("in determining the most reasonable rates, dispute resolution entities would be instructed to *look to the health plan's median payment rate for in-network rate care'* as such CBO estimated that payment rates in facilities where surprise bills are likely would *move toward the median in-network rate leading to reduced premiums and reduced federal deficits*"); Congressional Budget Office, H.R. 5800, Ban Surprise Billing Act (Feb. 11, 2020) ("CBO and JCT expect that under the bill, in facilities where surprise bills are likely, the average of payment rates for both in- and out-of-network care would *move toward the median in-network rate, which tends to be lower than average rates.*"); Congressional Budget Office, H.R. 2328, Reauthorizing and Extending America's Community Health Act (Sept. 18, 2019) ("Under H.R. 2328, CBO and JCT anticipate that in facilities where surprise bills are likely, payment rates would *move toward the median* and that *insurers' payments to providers currently commanding in-network rates well above the median would drop to more typical amounts.*").

### III.   Rowe's Fraudulent Scheme To Mislead IDREs

99.    As discussed above, before focusing on misusing the NSA, Rowe regularly commenced suit against insurers when they treated patients on an out-of-network basis and were dissatisfied with the payment they received. Those lawsuits were almost uniformly dismissed on a host of legal and factual grounds.

100.   Upon information and belief, Rowe engages in the fraudulent practice of "fee forgiving" by systematically and intentionally waiving and/or failing to attempt to collect the balance due from the patients they treat who are covered by the NYC PPO Plan – *i.e.*, the difference between Rowe's billed charge and the out-of-network benefits under the NYC PPO Plan. Fee forgiving drives up medical costs because, among other things, it diminishes the patient's incentive to seek treatment from in-network providers.

101.   One of the reasons Rowe does not pursue the balance is because their billed charge is a fictitious amount they never had any intention of pursuing, let alone expectation of collecting.

102.   To further illustrate that Rowe's billable charge for a bilateral breast reduction is and was fictitious, in 2020 and 2021, Rowe and Emblem entered into over one-hundred and fifty (150) SCAs in which they agreed that Rowe would be paid $25,500 for the primary surgeon and/or $4,080 for the assistant surgeon for a bilateral breast reduction. The SCAs were for patients who were enrolled in the NYC PPO Plan.

103.   A SCA is a one-time, patient-specific settlement agreement negotiated between Emblem and an out-of-network provider for a specific service.

104.   Rowe fraudulently induced Emblem to enter into the SCAs, and to agree to pay more than the out-of-network benefit under the NYC PPO Plan, by misrepresenting that they were

the only plastic surgery practice in New York and New Jersey that was using the so-called short-scar surgical technique in performing breast reductions. When Emblem discovered, however, that there were in-network providers who were using this technique and Rowe also failed to provide Emblem with documentation to support their claim that they were the only surgeons using this technique, Emblem declined in mid-2021 to enter into any additional SCAs with Rowe.

105.    When no SCA was entered into, Emblem paid Rowe the out-of-network benefit under the NYC PPO Plan when they performed a breast reduction on a patient enrolled in that plan. Rather than filing suit against Emblem or the insured/patient for the difference between the out-of-network benefits under the NYC PPO Plan and their fictitious billed charge (*i.e.*, balance bill), Defendants have accepted the applicable out-of-network benefits and continued to perform routine breast reductions on NYC PPO Plan members.

106.    This all changed, however, when Rowe determined that they could misuse the NSA to fraudulently obtain completely irrational awards through the IDR process.

107.    Unlike the due process and transparency that is required in traditional litigation or commercial arbitration, the NSA's IDR process is astonishingly opaque. The IDR process does not include any procedures to view, verify, or rebut the opposing party's submission, which is made *ex parte* and is not subject to any of the ordinary protections in litigation, including disclosure and cross-examination. There is no discovery, no evidentiary requirements, no testimony, and no hearing.

108.    While the initiating and non-initiating parties are each given permission to submit a variety of information, neither is entitled to, or in fact does, receive or see what the other submits to the IDRE.

109.    Because there is nothing stopping a dishonest provider from manufacturing, falsifying, and/or carefully curating the information it submits to defraud the IDRE into unwittingly issuing fraudulent and erroneous awards, this is simply a recipe for fraud.

110.    As outlined in the subsections below, although Emblem did not receive any of the information that Rowe submitted to the IDREs, the decisions rendered by the IDREs indicate on their face that Rowe provided false and misleading information in order to fraudulently induce the IDREs to accept Rowe's irrational IDR offers.

111.    Rowe's fraudulent scheme with respect to the IDR process included several components.

112.    *First*, Rowe performed the procedures at an in-network hospital instead of at an out-of-network facility that Rowe had access to in New York and New Jersey.

113.    *Second*, Rowe refrained from obtaining the NSA Notice and Consent form from their patients. There would have been no reason for the patient not to sign the form if Rowe had truthfully advised the patient that they do not pursue payment of the balance from the patient after receiving payment from Emblem.

114.    *Third*, despite their full awareness of the actual value of their services, as evidenced by (a) the $25,500 and $4,080 they accepted from Emblem for the primary and assistant surgeons in more than one-hundred and fifty (150) SCAs, (b) the under $10,000 they accepted in numerous breast reduction surgeries performed on NYC PPO Plan members where there was no SCA, and (c) Rowe's own admission that the cost of a breast reduction should be anywhere from $15,000 to $25,000, Rowe fraudulently submitted false and misleading offers to the IDREs seeking irrationally exorbitant amounts based on their fictitious "billed charges."

115.    *Fourth*, in support of their IDR offers, Rowe submitted falsified, misleading, incomplete, or otherwise knowingly and materially inaccurate information to the IDREs with the intent to mislead the IDREs into believing that Rowe's offer best represented the value of the services.

116.    For example (and without limitation), Rowe submitted false, inaccurate, or misleading information about:

(a)    The amount Defendants have accepted in payment from patients and Emblem for a bilateral breast reduction surgery under CPT Code 19318;

(b)    Rowe's skill and/or expertise and that the procedures they perform are "unique;"

(c)    Rowe's willingness and/or Emblem's alleged unwillingness to enter into a network agreement;

(d)    Rowe's supposed efforts to negotiate a network agreement with Emblem and Emblem's alleged refusal to reciprocate;

(e)    The alleged acuity of the Emblem-insured patients on whom Rowe performed breast reduction surgery, which in Rowe's own words is a "very common" and "routine" procedure where patient acuity is not likely to be an issue;

(f)    Quality and outcome measurements related to the breast reduction surgeries that Rowe performs;

(g)    The size of Rowe's practice and market share with respect to the market for patients interested in undergoing breast reduction surgery in New York and New Jersey; and

(h)    The teaching status, case mix, and scope of services that Rowe provide in their surgery mill.

117.    *Fifth*, more recently, and emboldened by the success of their fraudulent scheme, Rowe doubled their fictitious billed charge for the primary surgeon from $150,000 to $300,000 for a breast reduction under CPT Code 19318. Incredibly, they also increased their billed charge for the assistant surgeon to the same $300,000, so as to obtain even higher awards in IDR Proceedings.

118.    *Sixth*, Defendants have recently taken their fraudulent scheme to an even more egregious level by initiating two (2) separate IDR Proceedings for the primary and assistant surgeons for the same surgery, each seeking an award of at least $220,000 without disclosing the other pending IDR Proceeding to the IDREs.  Through this escalation in their fraudulent scheme, ***Rowe are currently securing completely irrational IDR awards totaling $440,000 for a single breast reduction procedure in which the QPA is below $10,000 and for which Rowe has historically been paid and accepted from approximately $6,000 to $30,000 in hundreds of surgeries they performed on NYC PPO Plan members.***

119.    The IDRE awards of $440,000 are double Rowe's billable charge before it was recently increased.

120.    Following are a few examples of the IDR awards Rowe has procured through fraud. These examples are representative of the IDR awards listed in Exhibit A hereto, each of which is the subject of Emblem's causes of action discussed below.

**(i)**

**Rowe Fraudulently Induced The IDRE To Award $112,500.00 In Payment
For A Bilateral Breast Reduction On November 27, 2024 (DISP-1928977)**

121.    Or about June 26, 2024, Dr. Rowe and another plastic surgeon affiliated with Rowe performed a pre-scheduled and elective bilateral breast reduction surgery at Hudson Hospital on a patient enrolled in the NYC PPO Plan ("Patient 1").[7]

122.    Upon information and belief, in and around June 26, 2024 when Patient 1's procedure was scheduled and performed, Dr. Rowe and the other surgeons affiliated with Rowe had access to one or more out-of-network facilities where they could have performed the procedure on Patient 1.

123.    Rowe scheduled Patient 1 to have her bilateral breast reduction surgery at Hudson Hospital because they intended from the outset to use the NSA's IDR process to extract a fraudulently inflated payment for this surgery and needed to have the surgery performed at an Emblem in-network facility in order to do so.

124.    As a subscriber to the NYC PPO Plan, Patient 1 had out-of-network benefits for the breast reduction procedure of approximately $5,548.10.

125.    Upon information and belief, at the time she scheduled and proceeded with the procedure, Patient 1 was informed and aware that Rowe were out-of-network providers and that she would be reimbursed (and Rowe would be paid) the amount of her out-of-network benefits under the NYC PPO Plan.

126.    Upon information and belief, Rowe failed to provide Patient 1 with the NSA Notice and Consent Form contemplated by Section 42 U.S.C. § 300gg-132(d), and/or Patient 1 declined

---

[7]    For confidentiality and privacy purposes, patient full names are not provided, and patients will be referred to solely in a generic fashion.

to sign it because Rowe failed to disclose that they do not and would not balance bill her for the difference between Rowe's billable charge and the amount paid by Emblem.

127. On July 4, 2024, Rowe submitted a claim to Emblem in which they fraudulently misrepresented that their billable charge for the primary and assistant surgeon for a bilateral breast reduction was $194,628.00 under CPT Code 19318 (with modifier 50) ("Patient 1 Fraudulent Claim").

128. The charge of $194,628.00 reflected in the Patient 1 Fraudulent Claim purported to be comprised of a charge of approximately $150,000 for Dr. Rowe's services as the primary surgeon and an additional charge of approximately $44,000 for the assistant surgeon.

129. When Rowe of NJ submitted the Patient 1 Fraudulent Claim to Emblem, Rowe knew that the claim was fraudulent because, among other things, the amount they sought in payment from Emblem was not based on the amounts paid to Rowe by Emblem and, upon information and belief, by other insurers and self-pay patients for a bilateral breast reduction.

130. When Rowe submitted the Patient 1 Fraudulent Claim to Emblem, they knew that Rowe had entered into approximately one-hundred and fifty (150) SCAs with Emblem in which they agreed to accept $25,500 for the services rendered by the primary surgeon and/or $4,080 for the assistant surgeon for a bilateral breast reduction.

131. On or about July 18, 2024, Emblem determined that $5,548.10 was the out-of-network benefit to which Patient 1was entitled under the terms of the NYC PPO Plan and remitted payment in the amount of $5,507.10 (net of Patient 1's $41 deductible) to Rowe.

132. On or about August 28, 2024, the law firm of Gottlieb & Greenspan, LLC ("Gottlieb & Greenspan") delivered an "Open Negotiation Notice" letter to Emblem on behalf of Rowe of

NJ purporting to open negotiations with respect to further payment from Emblem for Patient 1's June 26, 2024 surgery (the "August 28, 2024 ONN").

133.   In the August 28, 2024 ONN, Rowe "offered" to accept $175,165.20, representing ninety percent of their fraudulently inflated $194,628.00 billed charge, in additional payment for Patient 1's breast reduction surgery.

134.   Rowe's "offer" was not made in good faith in accordance with the NSA.

135.   Rowe's offer was based on their fraudulent billed charge.

136.   After delivering a fraudulent and bad faith "offer" in the August 28, 2024 ONN, neither Rowe nor their counsel made any effort to actually negotiate with Emblem over a reasonable and realistic payment amount for Patient 1's breast reduction surgery.

137.   Rowe had no interest or intention to negotiate in good faith because they already intended, as part of their fraudulent scheme, to initiate the IDR process and submit fraudulent information to the IDRE in order to procure an award in an amount far in excess of the value of their services and at or close to their exorbitant billed charges.

138.   On October 14, 2024, Rowe of NJ commenced an IDR with respect to their fraudulent claim for additional payment for Patient 1's breast reduction surgery.

139.   On or about November 4, 2024, Emblem submitted a "Notice of Offer Submission." Emblem's IDR offer was $5,548.10, which was the out-of-network benefit for this surgery under the NYC PPO Plan.

140.   Rowe's IDR offer was $112,500, an amount that dramatically exceeds what Rowe had historically accepted from Emblem for the exact same procedure under the exact same CPT Code.

141. In an award determination dated November 27, 2024, the IDRE accepted Rowe's offer and determined that Emblem should pay $112,500 for the breast reduction surgery performed on Patient 1 on June 26, 2024.

142. According to the IDRE's own statements, its determination was based upon multiple misrepresentations Rowe made in order to fraudulently induce the IDRE to select Rowe's offer.

143. The IDRE stated that Rowe submitted a statement asserting that Rowe is the "only physician" in his "small private practice" allegedly "making their market share insignificant" and "plac[ing them] at a disadvantage when negotiating with health plans."

144. Rowe's statement was knowingly false, fraudulent, and intentionally deceptive.

145. Rowe's private practice is *not* "small." It is a multi-million-dollar surgery mill comprised of numerous entities with seven (7) offices spanning three (3) states that performs hundreds, if not thousands, of breast reductions every year, generating multi-millions in revenue and profits.

146. Nor is Dr. Rowe the only physician. At that time and now, there were and are at least four plastic surgeons working in the practice: Dr. Rowe himself and three others: Dr. Charles Pierce, Dr. Lisa F. Schneider, and Dr. Xiaolu Xu, not to mention para-medical staff, support staff, and other non-medical staff required to operate each of the seven locations on a day-to-day basis.

147. Nor, for the same reason, is Rowe's market share minimal.

148. This was all part and parcel of Rowe's misrepresenting that the reason they are not an in-network provider with Emblem is because of the financial disparity between the parties. Of course, there are literally hundreds of Emblem in-network providers with practices that are a fraction of the size of Rowe's practices.

149. Rowe also misrepresented that, as a "small private practice," they had been unable to negotiate an in-network agreement with Emblem.

150. In truth and in fact, when Emblem reached out to Rowe about becoming an in-network provider in 2021, Rowe had no interest because they were determined to be overpaid for routine breast reduction surgeries.

151. Rowe have deliberately remained out-of-network with Emblem precisely so that they can continue to set fraudulently inflated billing rates and abuse the IDR process to defraud unwitting IDREs into believing they are entitled to be paid unconscionable amounts for breast reduction surgeries.

152. Rowe also misrepresented to the IDRE that Emblem "demonstrated a lack of good faith efforts to enter into an [settlement] agreement or single cast contract." No settlement offer was ever conveyed by Rowe or their counsel.  Rather, Rowe dispatched their counsel to convey a bad faith offer to "accept" 90% of Rowe's exorbitant billed charge, and counsel made clear that Rowe would not accept a penny less. Here again, the truth is miles apart from what Rowe misleadingly represented to the IDRE.

153. Rowe also failed to disclose to the IDRE that they had entered into over one-hundred and fifty (150) contracts/SCAs with Emblem in which they agreed accept $25,500 for the primary surgeon and/or $4,080 for the assistant surgeon for a bilateral breast reduction, and numerous other breast reduction surgeries where they accepted (without balance billing) the applicable out-of-network benefits under the NYC PPO Plan.

154. In addition, Rowe misrepresented to the IDRE that Dr. Rowe "has completed extensive research, numerous publications, and presentations." Despite extensive efforts, Emblem

has found no publications/papers or presentations authored by Dr. Rowe. He has, to the best of Emblem's knowledge, authored no peer-reviewed research papers.

155.    On information and belief, the only publications Dr. Rowe has authored are fluff pieces in magazines or the like that he uses for marketing, including on his websites.

156.    The IDRE's award also stated that it found Rowe's representations, including that they made a good faith effort to negotiate an in-network agreement, "*compelling* in substantiating that [Defendants'] offer best reflects the appropriate payment amount for this claim." (Emphasis added.) As discussed above, however, Rowe's "compelling" representation was false and misleading.

157.    Simply put, Rowe submitted false, inaccurate and misleading information which the IDRE unwittingly accepted as the truth and improperly awarded Rowe over $112,000 for a breast reduction procedure.

158.    This was fraud, pure and simple.

159.    Although the IDRE stated that it was utilizing the QPA calculated by Emblem, it then awarded Rowe an amount that was just shy of a staggering 10,000% of the QPA with absolutely no explanation for its completely irrational award.

**(ii)**

### Rowe Fraudulently Induced The IDRE To Award $150,000.00 In Payment For A Bilateral Breast Reduction On July 8, 2025 (DISP-3353641)

160.    On or about February 13, 2025, Dr. Pierce, a plastic surgeon affiliated with the Defendants, performed a pre-scheduled and elective bilateral breast reduction surgery at Monmouth Medical Center, located at 300 2nd Avenue, Long Branch, NJ 07740 ("Monmouth Hospital") on a patient enrolled in the NYC PPO Plan ("Patient 2").

161.     Upon information and belief, in and around February 13, 2025 when Patient 2's procedure was scheduled and performed, Dr. Pierce and the other surgeons affiliated with Rowe had access to one or more out-of-network facilities where they could have performed the procedure.

162.     Defendants scheduled Patient 2 to have her bilateral breast reduction surgery at Monmouth Hospital because they intended from the outset to use the NSA's IDR process to extract a fraudulently inflated payment for this surgery and needed to have the surgery performed at an Emblem in-network facility in order to do so.

163.     As a subscriber to the NYC PPO Plan, Patient 2 had out-of-network benefits for the breast reduction procedure of approximately $6,066.12.

164.     Upon information and belief, at the time she scheduled and proceeded with the procedure, Patient 2 was informed and aware that Dr. Pierce and the other surgeons were out-of-network providers, and that she would reimbursed (and Rowe would be paid) the out-of-network benefit under the NYC PPO Plan.

165.     Upon information and belief, Defendants failed to provide Patient 2 with the NSA Notice and Consent Form contemplated by Section 42 U.S.C. § 300gg-132(d), and/or Patient 2 declined to sign it because Rowe failed to disclose that they do not and would not balance bill her for the difference between Rowe's billable charge and the amount paid by Emblem.

166.     On or about February 22, 2025, East Coast submitted a claim to Emblem in which it fraudulently misrepresented that its billable charge for Patient 2's bilateral breast reduction was $194,628.00 ("Patient 2 Fraudulent Claim").

167.    The charge of $194,628.00 reflected in the Patient 2 Fraudulent Claim purported to be comprised of a charge of approximately $150,000 for Dr. Pierce's services as the primary surgeon and an additional charge of over $44,000 for the assistant surgeon.

168.    When East Coast submitted the Patient 2 Fraudulent Claim to Emblem, Defendants knew that the claim was fraudulent because, among other things, the amount they sought in payment from Emblem was not based on the amounts paid to Rowe by Emblem and, upon information and belief, by other insurers and self-pay patients for a bilateral breast reduction.

169.    When East Coast submitted the Patient 2 Fraudulent Claim to Emblem, Defendants knew that Rowe had entered into approximately one-hundred and fifty (150) SCAs with Emblem in which they agreed to accept $25,500 for the services rendered by the primary surgeon and $4,080 for the assistant surgeon for a bilateral breast reduction.

170.    On or about March 7, 2025, Emblem determined that $6,066.12 was the out-of-network benefit to which Patient 2 was entitled under the terms of the NYC PPO Plan and remitted payment to East Coast.

171.    On or about April 17, 2025, the law firm of Gottlieb & Greenspan delivered an "Open Negotiation Notice" letter to Emblem on behalf of East Coast purporting to open negotiations with respect to further payment from Emblem for Patient 2's February 13, 2025 surgery (the "April 17, 2025 ONN").

172.    In the April 17, 2025 ONN, East Coast "offered" to accept $175,165.20, representing ninety percent of its fraudulently inflated $194,628.00 billed charge, in additional payment for Patient 2's breast reduction surgery.

173.    Rowe's "offer" was not made in good faith in accordance with the NSA.

174.    Rowe's offer was based on the use of a fraudulently concocted billed charge.

175. After delivering a fraudulent and bad faith "offer" in the April 17, 2025 ONN, neither Rowe nor their counsel made any effort to actually negotiate with Emblem over a reasonable and realistic payment amount for Patient 2's breast reduction surgery.

176. Rowe had no interest or intention to negotiate in good faith because they already intended, as part of their fraudulent scheme, to initiate the IDR process and submit fraudulent information to the IDRE in order to procure a fraudulent award in an amount far in excess of the value of their services and at or close to their exorbitant billed charges.

177. On June 4, 2025, East Coast commenced an IDR with respect to their fraudulent claim for an additional payment related to Patient 2's breast reduction surgery.

178. East Coast's IDR offer was $150,000, representing approximately seventy-five percent (75%) of its fictitious billed charge of $194,628, and dramatically in excess of the amounts Rowe had historically accepted from Emblem for the exact same procedure.

179. By this time, Emblem realized that the IDREs were regularly accepting the irrational offers submitted by Rowe (and other providers). Thus, on or about June 26, 2025, and in an effort to mitigate its damages, under protest Emblem submitted an offer of $126,508.20, which it pointed out was the 80th Percentile FairHealth Rate.

180. In an award dated July 8, 2025, the IDRE determined that the "appropriate out-of-network rate" was the $150,000 offer submitted by Rowe.

181. In support of its determination, the IDRE indicated through use of checkmarks in a table that it believed the award was supported by information Rowe submitted concerning their level of training and experience, their market share, the alleged acuity of Patient 2, Rowe's teaching status and case mix, and Rowe's "demonstrations of good faith" in attempting to enter into network agreements.

182. The IDRE further stated in its determination, with absolutely no explanation, that Rowe's offer "adequately" took into account "the patient's acuity, the level of training and market share of the provider" and the quality of service. The IDRE's determination further stated that Rowe had "submitted information demonstrating its good faith efforts to enter into a network agreement with" Emblem, and that Rowe's "information demonstrates that [Rowe's] offer best represents the value of this unique qualified IDR item."

183. As discussed above, none of the purported information Rowe submitted to the IDRE was provided to Emblem.

184. The IDRE was defrauded by Rowe and its award was completely irrational.

185. First, Rowe has never attempted in good faith to enter into a network agreement with Emblem. Just to the contrary, Emblem attempted in good faith to enter into a network agreement with Rowe in 2021, which Rowe rejected. Rowe misrepresented these alleged facts to the IDRE.

186. Second, there is nothing "unique" about Rowe's services. Rowe obviously misrepresented to the IDRE, as they had previously misrepresented to Emblem, that they are the only practice (or one of the few) who perform breast reductions using either the "short-scar" or "SPAIR" (Short-Scar Periareolar Inferior Pedicle Reduction) techniques. There is no other explanation for the IDRE's characterization of a breast reduction as a "unique" qualified IDR item.

187. Third, how can the award of $150,000 "best represent" the value of Rowe's services when:

      (a)    Rowe entered into over one-hundred and fifty (150) SCAs with Emblem in which they agreed to accept $25,500 for the primary surgeon's and/or

$4,080 for the assistant surgeon's performance of a breast reduction on a NYC PPO Plan member;

(b)    Rowe accepted the NYC PPO Plan's out-of-network benefit of under $10,000 for numerous breast reductions they performed from 2020 thru 2024;

(c)    Upon information and belief, Rowe regularly accepts a fraction of their billed charge from insurers and self-pay patients;

(d)    Upon information and belief, Rowe does not pursue collection of the difference between their billed charge and the amount paid by Emblem, other insurers and/or their patients; and

(e)    Rowe's own website states that breast reductions cost between $15,000 and $25,000.

188.    Based on the IDRE's findings, the information submitted by Rowe to the IDRE was plainly false and misleading. Further, the IDRE's award was unsupported, completely irrational and made in manifest disregard of the law.

**(iii)**

**Rowe Fraudulently Induced The IDRE To Award $ 340,000 In Payment For A Bilateral Breast Reduction Performed On May 21 2025 (DISP-4033478 and DISP-4035800)**

189.    During 2025, Rowe introduced a new component to their ongoing fraudulent scheme.

190.    Having seen that they could fraudulently induce IDREs to award them literally whatever amount they asked for by arguing that it was their billable charge, Rowe simply increased their billable charge for the primary surgeon from $150,000 to $200,000. Rowe also increased their

billable charge for the assistant surgeon to the same $200,000. Rowe thus began representing to the IDREs that their billable charge was $400,000 for a bilateral breast reduction procedure.

191.    To even further increase the amount awarded by the IDREs, instead of filing a single IDR Proceeding for both the primary and assistant surgeons, as part of their fraudulent scheme Rowe began filing a separate IDR Proceeding for the primary and assistant surgeon's services for the same surgery.

192.    On or about May 21, 2025, Dr. Rowe, and Dr. Xu performed a pre-scheduled and elective bilateral breast reduction surgery at Hudson Hospital on a patient enrolled in the NYC PPO Plan ("Patient 3").

193.    Upon information and belief, in and around May 21, 2025, when Patient 3's procedure was scheduled and performed, Dr. Rowe and the other surgeons affiliated with Rowe had access to one or more out-of-network facilities where they could have performed the procedure.

194.    As a subscriber to the NYC PPO Plan, Patient 3 had out-of-network benefits for the primary surgeon's performance of the breast reduction procedure of approximately $5,672.54.

195.    Upon information and belief, at the time she scheduled and proceeded with the procedure, Patient 3 was informed and aware that Dr. Rowe and the other surgeons were out-of-network providers, that she would be reimbursed (and Rowe would be paid) the out-of-network benefits under the NYC PPO Plan.

196.    Defendants scheduled Patient 3 to have her bilateral breast reduction surgery at Hudson Hospital because they intended from the outset to use the NSA's IDR process to extract a fraudulently inflated payment for this surgery and needed to have the surgery performed at an Emblem in-network facility in order to do so.

197.    Upon information and belief, Defendants failed to provide Patient 3 with the NSA Notice and Consent Form contemplated by Section 42 U.S.C. § 300gg-132(d), and/or Patient 3 declined to sign it because Rowe failed to disclose that they do not and would not balance bill her for the difference between Rowe's billable charge and the amount paid by Emblem.

198.    On or about June 5, 2025, Rowe submitted a claim to Emblem in which it fraudulently misrepresented that its billable charge for the primary surgeon for the bilateral breast reduction was $194,628.00 ("Patient 3 Primary Surgeon Fraudulent Claim").

199.    When Rowe submitted the Patient 3 Primary Surgeon Fraudulent Claim to Emblem, Defendants knew that the claim was fraudulent because, among other things, the amount they sought in payment from Emblem was not based on the amounts paid to Rowe by Emblem and, upon information and belief, by other insurers and self-pay patients for a bilateral breast reduction.

200.    When Rowe submitted the Patient 3 Primary Surgeon Fraudulent Claim to Emblem, they knew that Rowe had entered into approximately one-hundred and fifty (150) SCAs with Emblem in which they agreed to accept $25,500 for the services rendered by the primary surgeon.

201.    On or about June 20, 2025, Emblem determined that $5,672.54 was the out-of-network benefit to which Patient 3 was entitled for the primary surgeon under the terms of the NYC PPO Plan in which she was enrolled and remitted payment to Rowe.

202.    On or about July 25, 2025, the law firm of Gottlieb & Greenspan delivered an "Open Negotiation Notice" letter to Emblem on behalf of Rowe purporting to open negotiations with respect to further payment from Emblem to for Patient 3's May 21, 2025 surgery (the "July 25, 2025 Primary Surgeon ONN").

203.     In the July 25, 2025 Primary Surgeon ONN, Rowe "offered" to accept $175,165.20, representing ninety percent of its fraudulently inflated $194,628.00 billed charge, in additional payment for Patient 3's breast reduction surgery.

204.     Rowe's "offer" was not made in good faith in accordance with the NSA.

205.     Rowe's offer was based on the use of a fictitious and fraudulently concocted billed charge.

206.     After delivering a fraudulent and bad faith "offer" in the July 25, 2025 ONN, neither Rowe nor their counsel made any effort to actually negotiate with Emblem over a reasonable and realistic payment amount for Patient 3's breast reduction surgery.

207.     Rowe had no interest or intention to negotiate in good faith because they already intended, as part of their fraudulent scheme, to initiate the IDR process and submit fraudulent information to the IDRE in order to procure a fraudulent award in an amount far in excess of the value of their services and at or close to their exorbitant billed charges.

208.     On September 9, 2025, Rowe commenced an IDR with respect to Patient 3's breast reduction surgery (the "Patient 3 Primary Surgeon IDR").

209.     Rowe's offer in the Patient 3 Primary Surgeon IDR was $145,971, representing nearly seventy-five percent (75%) of its billed charge of $194,628.

210.     In its September 12, 2025 response to the Patient 3 Primary Surgeon IDR, Emblem argued, among other things, that:

> This case involves an elective procedure that the nonparticipating provider prescheduled to be performed in a participating facility. The insured was fully aware that the provider now seeking to exploit this IDR process was a nonparticipating provider. The insured was notified prior to the surgery that the provider was nonparticipating, and/or that the insured should confirm the provider's status, including in the preauthorization decision letter and/or past explanation of benefits from claim history. Moreover, a review of the

insured's claims history shows that the insured is a regular patient with this provider. . . The provider here has a pattern of exploiting the NSA IDR process, even for elective, prescheduled procedures, because the NSA IDR offers the provider a potential opportunity to secure a reimbursement that is far in excess of what it would otherwise be entitled to receive. . . To ensure that it continues to have the NSA IDR process at its disposal, the provider has refused to negotiate, or to negotiate in good faith to enter into a network agreement.

211. Emblem further argued to the IDRE that "**The initiating party requested the high amount of $175,165.20.** This is excessive. **The median in-network rate paid to providers of the same specialty per all claims paid in the last two years is the amount of $5,142.84.**" (Color and bold in original.).

212. Emblem submitted 17 pages of claims showing the amounts billed by and paid to other in-network providers for bilateral breast reduction surgeries in approximately 1,000 surgeries from which Emblem calculated the QPA of $5,142.84.

213. In an award dated November 18, 2025, the IDRE determined that "the appropriate out-of-network rate" was $145,971.00 for the breast reduction procedure performed on Patient 3.

214. In support of its determination, the IDRE indicated through use of checkmarks in a table that it believed the award was supported by information submitted by Rowe concerning their level of training and experience, their market share, the alleged acuity of Patient 3, Rowe's alleged teaching status and case mix, and Rowe's "demonstrations of good faith" in attempting to enter into network agreements.

215. The IDRE's determination stated, without any explanation, that it "found the most compelling evidence in this case to be the patient acuity and complexity of care . . . in addition to the level of training and experience of the provider in furnishing the service in question."

216.    Because Rowe's *ex parte* submission was not given to Emblem, Emblem has no idea what purported "patient acuity" was referred to or what supposedly was "complex" about the breast reduction, which Rowe concedes on their website is one of the most common procedures.

217.    Similarly, while the IDRE referred to evidence of Rowe's "training and experience" as being "most persuasive," Rowe has no specialized training that sets him apart from the numerous Emblem in-network plastic surgeons who are paid and accept a median of $5,672.64 for a breast reduction surgery.

218.    Rowe does not formally teach or train other surgeons. To the best of Emblem's knowledge, Rowe has never authored a peer-reviewed research paper or received any awards of note.

219.    Upon information and belief, Rowe misrepresented to the IDRE that his practice is the sole or one of the only plastic surgery practices that uses the "short-scar" or SPAIR techniques, thereby misleading the IDRE to believe that Rowe possessed some unique specialized training or experience.

220.    The IDRE did not explain how or why Rowe's unspecified training or experience, or the patient's purported acuity, supported awarding Rowe almost their full billed charges.

221.    Upon information and belief, Rowe submitted additional false and misleading information to the IDRE, including misrepresenting the same facts discussed above that they have misrepresented in other IDRE proceedings, resulting in the IDRE's completely irrational award.

222.    On or about June 5, 2025, Rowe submitted a second separate claim to Emblem in which they fraudulently misrepresented that their billable charge for Dr. Xu's services as the assistant surgeon for Patient 3's bilateral breast reduction was an astounding $194,628.00 – the same charge as the primary surgeon ("Patient 3 Assistant Surgeon Fraudulent Claim").

223.   When Rowe submitted the Patient 3 Assistant Surgeon Fraudulent Claim to Emblem on or about June 5, 2025, Rowe knew that the claim was fraudulent because, among other things, the amount they sought in payment from Emblem was not based on the amounts paid to Rowe by Emblem and, upon information and belief, by other insurers and self-pay patients for an assistant surgeon's assistance in a bilateral breast reduction.

224.   When Rowe submitted the Patient 3 Assistant Surgeon Fraudulent Claim to Emblem, they knew that Rowe had entered into numerous SCAs with Emblem in which they agreed to accept $4,080 for the assistant surgeon for a bilateral breast reduction.

225.   On or about June 19, 2025, Emblem determined that $887.70 was the out-of-network benefit to which Patient 3 was entitled under the terms of the NYC PPO Plan for an assistant surgeon and remitted payment in the amount of $768.70 (net of Patient 3's $119 deductible) to Rowe.

226.   On or about July 25, 2025, the law firm of Gottlieb & Greenspan delivered a second "Open Negotiation Notice" letter to Emblem on behalf of Rowe for the assistant surgeon's services for Patient 3's breast reduction surgery (the "July 25, 2025 Assistant Surgeon ONN").

227.   In the July 25, 2025 Assistant Surgeon ONN, Rowe "offered" to accept $175,165.20, representing ninety percent of their fraudulently inflated $194,628.00 billed charge for Dr. Xu's service as an assistant surgeon for Patient 3's breast reduction surgery.

228.   In other words, between the two Open Negotiation Notices, Rowe offered to accept $350,330.40 for Patient 3's breast reduction procedure on May 21, 2025.

229.   Rowe's "offer" was not made in good faith in accordance with the NSA.

230.   Rowe's offer was based on the use of fictitious and fraudulently concocted billed charges.

231.    After delivering a fraudulent and bad faith "offer" in the July 25, 2025 Assistant Surgeon ONN, neither Rowe nor their counsel made any effort to actually negotiate with Emblem over a reasonable and realistic payment amount for Patient 3's breast reduction surgery.

232.    Rowe had no interest or intention to negotiate in good faith because they already intended, as part of their fraudulent scheme, to initiate the IDR process and submit fraudulent information to the IDRE in order to procure an award far in excess of the value of their services and at or close to their exorbitant billed charges.

233.    On September 9, 2025, Rowe commenced a second IDR for the assistant surgeon's participation in Patient 3's breast reduction procedure (the "Patient 3 Assistant Surgeon IDR").

234.    In its response form submitted on or about September 12, 2025, Emblem offered $15,091.53, noting that represented "20% of the 80th FairHealth Percentile Rate for the procedure if billed by the primary surgeon." Emblem further explained that "Assistant-at-Surgery procedures have a payment reduction as they are assisting with the surgery.

235.    In its IDR submission, Emblem further argued, among other things, that:

> The provider here has a pattern of exploiting the NSA IDR process, even for elective, prescheduled procedures, because the NSA IDR offers the provider a potential opportunity to secure a reimbursement that is far in excess of what it would otherwise be entitled to receive. . . . To ensure that it continues to have the NSA IDR process at its disposal, the provider has refused to negotiate, or to negotiate in good faith to enter into a network agreement. That fact is a material fact that this tribunal must consider when evaluating the provider's offer.  See 45 C.F.R. § 149.510(c)(4)(iii)(B)(5).

236.    Emblem argued that "Per reimbursement policies, an assistant surgeon should not be paid more than the primary surgeon" and noted that "[t]his reimbursement policy is in alignment with CMS Reimbursement Policy."

237.    Emblem further noted that the "out-of-network Assistant Surgeon is billing and requesting much more money than any in-network primary surgeon specialty that has been paid

in-network and way more than any Physician Assistant provider has been paid for assistant-at-surgery services.

238.    In contrast to Emblem's offer, Rowe submitted an offer of 100% of its fraudulently inflated billed charge of $194,628. This is the very figure that the NSA expressly states cannot be considered and should not be paid.

239.    In an award dated October 18, 2025, the IDRE "determined that the out-of-network payment amount of $194,628.00 offered by Rowe [ ] is the appropriate out-of-network rate" to be awarded for Dr. Xu's participation as an assistant surgeon in Patient 3's breast reduction surgery. To highlight how irrational this award is, it was $50,000 more than the $145,971 awarded to Dr. Rowe for his services as the *primary* surgeon in Patient 3's breast reduction procedure.

240.    Between the two awards rendered in the Patient 3 Primary Surgeon IDR and the Patient 3 Assistant Surgeon IDR, Rowe succeeded in obtaining a staggering $340,599 for a single breast reduction procedure performed on Patient 3.

241.    The IDRE knew or should have known that its award represented Rowe's purported "billed charge" for Dr. Xu's services, the very thing that Section 300gg-111(c)(5)(D) of the NSA prohibits even being considered, much less awarded, because Emblem's submission to the IDRE included a copy of the Patient 3 Assistant Surgeon Fraudulent Claim form reflecting the $194,628.00 billed charge.

242.    According to the IDRE, Rowe "submitted evidence concerning the parties' contractual history. . . show[ing] that the prior rate of payment for the same or similar services was closer to [Rowe's] offer in this case." The IDREs' statement that Rowe submitted evidence of an alleged "contracting history" with Emblem and that "such evidence shows that the prior rate of

payment for the same or similar services was closed to [Rowe's] offer" makes crystal clear that Rowe misrepresented these facts to the IDRE.

243. Emblem has no contractual history of paying Rowe an amount that is remotely close to $194,000 for a bilateral breast reduction, let alone for the assistant surgeon. Just the opposite is true. The amount Rowe and Emblem agreed to in SCA's was $4,080 for the assistant surgeon. The only possible conclusion is that Rowe fraudulently misrepresented to the IDRE the rate they had agreed to in SCA's with Emblem.

244. The IDRE further indicated that it had considered information provided by Rowe allegedly concerning "Demonstrations of good faith efforts (or lack of good faith efforts) . . . to enter into network agreements." Here, too, based on the IDREs' statements, Rowe plainly misrepresented the facts. That is because, as discussed above, Rowe rejected Emblem's approach to enter into an in-network agreement in 2021, and since then has never applied to become an in-network provider.

245. The IDRE further stated that Rowe's "offer best represents the value of this unique qualified IDR item or service."

246. There is nothing "unique" about the breast reduction surgeries performed by Rowe. As Rowe advertises on their website, they are among the most common procedures that any plastic surgeon can perform. Upon information and belief, the IDRE referred to Rowe's services as "unique" because Rowe misrepresented to the IDRE that they are one of the few or the only practice using the short-scar or SPAIR techniques.

247. The IDRE also indicated that it had favorably considered information provided by Rowe on their level of training, experience and quality of services. Dr. Xu, however, was only one year out of his residency at the time the IDRE found that his level of training and experience

warranted a fee of $194,000 for his services as the assistant surgeon – as opposed to the standard 16% of the primary surgeon's charge.

248.   In its award, the IDRE also checked a box indicating that it considered "the market share held by" Rowe in the geographic region.  Upon information and belief, the information Rowe submitted to the IDRE was false and misleading because Rowe failed to disclose that they operate seven (7) offices in New York, New Jersey, and Florida, and failed to accurately portray the size, scope, and profitability of the Rowe practice.

249.   Moreover, Rowe have the same market share and the same market bargaining power as any of the other hundreds of plastic surgeons who perform breast reduction procedures, including in-network providers, and accept a fraction of the amount that Rowe persuaded the IDRE to award.

250.   The market share information that the IDRE indicates it received and relied upon from Rowe could only have been false or misleading.

251.   For the same reasons articulated above, the same is true of the information Rowe provided to the IDRE about patient acuity, which the IDRE stated it relied upon without any description as to what it received.

252.   In the last sentence of its one-paragraph decision, the IDRE found that Rowe's offer best "represents the value" of a breast reduction surgery. This statement is and was wholly unexplained. Moreover, it is and was completely irrational in view of the parties' contracting history and the various other factors discussed above.

253.   By awarding Rowe their billed charges, the IDR violated the provisions and intent of the NSA, which is not intended to award out-of-network providers their non-market based billed charges.

254. The IDREs conclusion that Rowe's billable charges "represent the value" of the services was unsupported, completely irrational, and made in manifest disregard of the law.

**(iv)**

**Rowe Fraudulently Induced The IDRE To Award $440,000.00 In Payment For A Bilateral Breast Reduction On December 29, 2025 (DISP-4466639 and DISP-4545922)**

255. As part of their fraudulent scheme, later in 2025, Rowe increased their billable charge yet again; for the primary surgeon from $194,628 to a jaw dropping $300,000 (doubling the "billable charge" from its already inflated rate of $150,000 in less than a year). Rowe also increased their billable charge for the assistant surgeon to an incredible $300,000. Rowe was and is now billing $600,000 for a bilateral breast reduction procedure.

256. Rowe continued to file two (2) separate IDR proceedings for the primary and assistant surgeons in order to fraudulently induce two unwitting IDREs to award two completely irrational awards for the same procedure.

257. On or about August 13, 2025, Dr. Rowe (as primary) and Dr. Pierce (as assistant) performed a pre-scheduled and elective bilateral breast reduction surgery at Hudson Hospital on a patient enrolled in the NYC PPO Plan ("Patient 4").

258. Upon information and belief, in and around August 13 2025, when Patient 4's procedure was scheduled and performed, Dr. Rowe and the other surgeons affiliated with Rowe had access to one or more out-of-network facilities where they could have performed the procedure.

259. As a subscriber to the NYC PPO Plan, Patient 4 had out-of-network benefits for the breast reduction procedure of approximately $6,193.91.

260. Defendants scheduled Patient 4 to have her bilateral breast reduction surgery at Hudson Hospital because they intended from the outset to use the NSA's IDR process to extract a

fraudulently inflated payment for this surgery and needed to have the surgery performed at an Emblem in-network facility in order to do so.

261. Upon information and belief, at the time she scheduled and proceeded with the procedure, Patient 4 was informed and aware that Dr. Rowe and the other Defendants were out-of-network providers, and that she would be reimbursed (and Rowe would be paid) the out-of-network benefit under the NYC PPO Plan.

262. Upon information and belief, Rowe failed to provide Patient 4 with the NSA Notice and Consent Form contemplated by Section 42 U.S.C. § 300gg-132(d), and/or Patient 4 declined to sign it because Rowe failed to disclose that they do not and would not balance bill her for the difference between Rowe's billable charge and the amount paid by Emblem.

263. On or about August 30, 2025, Rowe submitted a claim to Emblem in which they fraudulently misrepresented that their billable charge for a bilateral breast reduction for the primary surgeon was now $300,000 ("Patient 4 Fraudulent Claim").

264. When Rowe submitted the Patient 4 Fraudulent Claim to Emblem on or about August 30, 2025, Defendants knew that the claim was fraudulent because, among other things, the amount they sought in payment from Emblem was not based on the amounts paid to Rowe by Emblem and, upon information and belief, by other insurers or self-pay patients for a bilateral breast reduction.

265. When Rowe submitted the Patient 4 Fraudulent Claim to Emblem, they knew that Rowe had entered into approximately one-hundred and fifty (150) SCAs with Emblem in which they agreed to accept $25,500 for the services rendered by the primary surgeon and/or $4,080 for the assistant surgeon for a bilateral breast reduction.

266.     When Rowe submitted the Patient 4 Fraudulent Claim to Emblem, they knew that Rowe on numerous occasions had accepted the NYC Plan PPO's out-of-network benefit of less than $10,000 for breast reductions from 2020 thru 2024.

267.     On or about September 5, 2025, Emblem determined that $6,193.91 was the out-of-network benefit for the primary surgeon to which Patient 4 was entitled under the terms of the NYC PPO Plan and remitted payment in that amount to Rowe.

268.     On or about September 22, 2025, the law firm of Gottlieb & Greenspan delivered an "Open Negotiation Notice" letter to Emblem on behalf of Rowe of NJ purporting to open negotiations with respect to further payment from Emblem for Patient 4's August 13, 2025 surgery (the "September 22, 2025 ONN").

269.     In the September 22, 2025 ONN, Rowe "offered" to accept $270,000.00, representing ninety percent of their fraudulently inflated $300,000.00 billed charge (and 180% of the billable charge they had demanded just months earlier) for the primary surgeon.

270.     Rowe's "offer" was not made in good faith in accordance with the NSA.

271.     Rowe's offer was based on their use of a fraudulently concocted and fictitious billed charge.

272.     After delivering a fraudulent and bad faith "offer" in the September 22, 2025 ONN, neither Rowe nor their counsel made any effort to actually negotiate with Emblem over a reasonable and realistic payment amount for Patient 4's breast reduction surgery.

273.     Rowe had no interest or intention to negotiate in good faith because they intended, as part of their fraudulent scheme, to initiate the IDR process and submit fraudulent information to the IDRE in order to procure an exorbitant award in an amount far in excess of the value of their services and at or close to their fraudulently inflated billed charges.

274. On November 5, 2025, Rowe commenced an IDR with respect to the primary surgeon's performance of Patient 4's breast reduction surgery (the "Patient 4 Primary Surgeon IDR").

275. In its November 5, 2025 submission commencing the Patient 4 Primary Surgeon IDR, Rowe represented that the QPA for the surgery in question was $6,165.91.

276. Rowe's IDR offer was $220,000, representing approximately seventy-three percent (73%) of its billed charge of $300,0000.

277. In its response form submitted on or about November 26, 2025, Emblem offered $81,344.01, which represented 1,319.25% of the $6,165.91 QPA.

278. In support of its offer, Emblem submitted a written statement (and various supporting documents) in which it argued (among other things):

> Under protest, we are submitting our notice of offer for CPT code 19318-50 in the amount of $81,344.01 compared to the opposed initiating parties incorrect open negotiated amount of $270,000.00. This is higher than what we have paid in the last two years for this procedure. It is the 80th Percentile Fair Health Rate for the procedure in the geographic area where the services were rendered.

279. In an award dated December 29, 2025, the IDRE determined that the "appropriate out-of-network rate" was $220,000.

280. In support of its determination, the IDRE indicated through use of checkmarks in a table that it believed the award was supported by information Rowe submitted concerning their level of training, their market share, the alleged acuity of Patient 4, Rowe's teaching status and Rowe's "demonstrations of good faith" in attempting to enter into network agreements, and the "contracted rates between the disputing parties during the previous 4 plan years."

281.   According to the IDRE, Rowe "submitted evidence concerning the parties' contractual history. . . show[ing] that the prior rate of payment for the same or similar services was closer to [Rowe's] offer in this case."

282.   To the best of Emblem's knowledge and belief, it has never entered into a contract with Rowe to pay an amount that is even remotely close to $220,000 for the primary surgeon's performance of a breast reduction. Based upon the parties' "contractual history," the information Rowe submitted to the IDRE plainly misrepresented the facts, including that the parties had entered into contracts that were "closer" to Rowe's $220,000 offer than to Emblem's offer of $81,344.01.

283.   As with every IDRE Proceeding, Emblem was not provided with a copy of what Rowe submitted to the IDRE nor any opportunity to address it.

284.   In its award, the IDRE also checked boxes indicating, without any explanation, that it considered Rowe's alleged "level of training, experience, and quality and outcomes measurements of the provider or facility", "the market share held by" Rowe in the geographic region, the alleged "acuity" of Patient 4, Rowe's alleged "teaching status, case mix and scope of services," and Rowe's alleged "[d]emonstration[] of good faith efforts . . . to enter into network agreements." As previously discussed with respect to the IDR awards above, none of these factors supports a $220,000 award to Rowe for a breast reduction surgery, and the information submitted to the IDRE by Rowe with respect to these factors must have been false and misleading.

285.   It is impossible to discern what the IDRE considered or was referring to as the level of training or experience of the "provider or "facility," which it did not explain  Further, the IDRE's statement that it considered the level of training (or experience) of the "facility" makes no sense; surgical facilities and hospitals are not trained or experienced.

286.    In addition, under the NYC PPO Plan, the hospital (*i.e.*, facility) charges were covered by Anthem/Empire Blue Cross and Blue Shield, not by Emblem, and was not part of the services Rowe billed to Emblem and for which Rowe was seeking payment in the IDR Proceeding. Emblem only covers the professional/physician charges under the NYC PPO Plan. Accordingly, the facility/hospital charge, along with the hospital/facility's experience, was wholly irrelevant.

287.    Without any explanation, the IDRE further concluded that Rowe's $220,000 "offer best represents the value of this unique qualified IDR item or service." The IDRE did not explain, let alone address, how or why the primary surgeon should be paid $220,000 for a bilateral breast reduction: (i) that Rowe's own website states should cost $15,000 to $25,000 for both the primary and assistant surgeons; (ii) for which Rowe accepted payments from Emblem of under $10,000 for literally hundreds of breast reductions performed on patients enrolled in the NYC PPO Plan; and (iii) for which Rowe accepted $25,500 in many SCAs they entered into with Emblem.

288.    The IDRE's award in the Patient 4 Primary Surgeon IDR was 3,568% of the $6,165.91 QPA, which the IDRE did not even address.

289.    The IDREs award was procured by Rowe's fraud and misrepresentations and was completely irrational.

290.    On August 30, 2025, Rowe submitted a second claim seeking an additional $300,000 in payment for the assistant surgeon's services for the breast reduction surgery on Patient 4 on August 13, 2025.

291.    On September 9, 2025, Emblem determined that $1,095.34 was the out-of-network benefit for the assistant surgeon to which Patient 4 was entitled under the terms of the NYC PPO Plan and remitted payment to Rowe.

292. On October 1, 2025, Rowe's attorney, Gottlieb & Greenspan, sent a second "Open Negotiation Notice" letter to Emblem on behalf of Rowe for the assistant surgeon's services for the breast reduction surgery on Patient 4.

293. The Open Negotiation Notice letter offered to accept 90% of the assistant surgeon's billed charge of $300,000 – *i.e.*, $270,000.

294. In other words, between the two Open Negotiation Notices, Rowe offered to accept $540,000 for Patient 4's breast reduction procedure on August 13, 2025.

295. Rowe subsequently filed a second IDR Proceeding for the assistant surgeon's participation in Patient 4's breast reduction procedure (the "Patient 4 Assistant Surgeon IDR").

296. Because of the massive volume of IDRs that Rowe was filing and Rowe's failure to disclose that they had filed two (2) IDR Proceedings for a single surgery that were before two different IDRE entities, Emblem and the IDRE were deceived into believing that the Patient 4 Assistant Surgeon IDR was for a different breast reduction procedure than the Patient 4 Primary Surgeon IDR.

297. Rowe offered to accept $220,000 for the assistant surgeon in the Patient 4 Assistant Surgeon IDR.

298. Not realizing that the Patient 4 Assistant Surgeon IDR was for the assistant surgeon, and desperate to mitigate its damages from the IDREs' irrational awards, Emblem offered $81,344.01.

299. The QPA for the assistant surgeon was $1,095.34.

300. The IDRE determined that Rowe's offer was "the appropriate out-of-network rate" and awarded $220,000.

301.    The IDRE's decision was completely irrational. Besides rejecting Rowe's argument "that the Federal Government expects that the results of these NSA arbitrations will be greater than the QPA amounts," there was absolutely no discussion of the relevant factors. Then, after rejecting Rowe's argument that the expectation was that awards would be greater than the QPA when the NSA was passed, the IDRE chose Rowe's offer notwithstanding that it was a staggering 20,085% of the QPA.

302.    There is no explanation of why the IDRE found that Rowe's offer "represents the best value" of the services at issue.

303.    There is no explanation of why an award of $220,000 for the assistant surgeon's performance of a breast reduction has any basis or support in the facts or evidence, or represents the "best value."

304.    The IDREs' awards did not explain how a single one of the relevant factors, let alone any evidence submitted by Rowe, supported an award of $220,000 for either the primary or assistant surgeon.

305.    Upon information and belief, besides an irrational award rendered by an IDRE, no insurer, self-pay patient or court has paid Rowe $440,000 for a bilateral breast reduction.

306.    The IDREs' awards were not only procured through fraud, they were completely irrational and entered in manifest disregard of the law.

**(v)**

**Rowe Fraudulently Induced The IDRE To Award $440,000.00 In Payment For
A Single Bilateral Breast Reduction (DISP4406988 and DISP-4416327)**

307.    On or about July 9, 2025, Dr. Rowe and Dr. Xu performed a pre-scheduled and elective bilateral breast reduction surgery at Hudson Hospital on a patient enrolled in the NYC PPO Plan ("Patient 5").

308. Upon information and belief, in and around July 9, 2025, when Patient 5's procedure was scheduled and performed, Dr. Rowe, Dr. Xu and the other surgeons affiliated with Rowe had access to one or more out-of-network facilities where they could have performed the procedure.

309. Indeed, prior to her surgery, Patient 5 met with Dr. Rowe, Dr. Xu, and/or other members of Rowe's staff at least three times at Rowe's offices located in New York at 820 Park Avenue (on January 6, 2025, January 13, 2025, and June 30, 2025). Rowe billed Emblem for those office visits through a different entity (Norman M. Rowe MD PLLC) than the one that allegedly performed the surgery itself (Rowe of NJ).

310. Rowe scheduled Patient 5 to have her bilateral breast reduction surgery at Hudson Hospital because they intended from the outset to use the NSA's IDR process to extract a fraudulently inflated payment for this surgery and needed to have the surgery performed at an Emblem in-network facility in order to do so.

311. As a subscriber to the NYC PPO Plan, Patient 5 had out-of-network benefits for a breast reduction procedure of approximately $6,193.91.

312. Upon information and belief, at the time she scheduled and proceeded with the procedure, Patient 5 was informed and aware that Dr. Rowe, Dr. Xu, and the other Rowe surgeons were out-of-network providers, and that she would be reimbursed (and Rowe would be paid) in the amount of the out-of-network benefits under the NYC PPO Plan.

313. Upon information and belief, Rowe failed to provide Patient 5 with the NSA Notice and Consent Form contemplated by Section 42 U.S.C. § 300gg-132(d) for patients who voluntarily choose to proceed with scheduled elective, out-of-network care, and/or Patient 5 declined to sign

it because Rowe failed to disclose that they do not and would not balance bill her for the difference between Rowe's billable charge and the amount paid by Emblem.

314. On or about August 7, 2025, Rowe submitted a claim to Emblem in which it fraudulently misrepresented that their billable charge for the primary surgeon's performance of a bilateral breast reduction was $300,000.00 ("Patient 5 Primary Surgeon Fraudulent Claim").

315. When Rowe submitted the Patient 5 Primary Surgeon Fraudulent Claim to Emblem, Rowe knew that the claim was fraudulent because, among other things, the amount they sought in payment from Emblem was not based on the amounts paid to Rowe by Emblem and, upon information and belief, by other insurers or self-pay patients for the primary surgeon's performance of a bilateral breast reduction.

316. When Rowe submitted the Patient 5 Primary Surgeon Fraudulent Claim to Emblem, they knew that Rowe had entered into approximately one-hundred and fifty (150) SCAs with Emblem in which they agreed to accept $25,500 for the primary surgeon's performance of a bilateral breast reduction and/or $4,080 for the assistant surgeon.

317. When Rowe submitted the Patient 5 Primary Surgeon claim to Emblem, they knew that Rowe had accepted the out-of-network payment amount of less than $10,000 under the NYC PPO Plan from Emblem in numerous surgeries from 2020 thru 2024 without balance billing the patients.

318. On or about August 7, 2025, Rowe submitted a second claim to Emblem in which it fraudulently misrepresented that its billable charge for Dr. Xu's services as the assistant surgeon for the bilateral breast reduction performed on Patient 5 was also $300,000.00 ("Patient 5 Assistant Surgeon Fraudulent Claim").

319. When Rowe submitted the Patient 5 Assistant Surgeon Fraudulent Claim to Emblem, Rowe knew that the claim was fraudulent because, among other things, the amount they sought in payment from Emblem was not even remotely based on the amounts paid to Rowe by Emblem and, upon information and belief, by other insurers or self-pay patients for an assistant surgeon for a bilateral breast reduction.

320. When Rowe submitted the Patient 5 Assistant Surgeon Fraudulent Claim to Emblem, they also knew that Rowe had accepted, in arms-length market-based transactions with both Emblem and, upon information and belief, other insurers and self-pay patients, a fraction of the $300,000 charge for an assistant surgeon's performance of a bilateral breast reduction.

321. When Rowe submitted the Patient 5 Assistant Surgeon Fraudulent Claim to Emblem, they knew that Rowe had entered into numerous SCAs with Emblem in which they had agreed to accept $4,080 for the assistant surgeon's performance of a bilateral breast reduction, and that Rowe had accepted an even smaller amount in numerous claims submitted to Emblem in which they were paid and accepted the applicable benefit amount for out-of-network services under the NYC PPO Plan.

322. On or about August 21, 2025, Emblem determined that $3,386.26 was the out-of-network benefit to which Patient 5 was entitled under the terms of the NYC PPO Plan in which she was enrolled with respect to Dr. Rowe's role as the primary surgeon for her bilateral breast reduction procedure and remitted payment to Rowe.

323. On or about August 22, 2025, Emblem determined that $547.67 was the out-of-network benefit to which Patient 5 was entitled under the terms of the NYC PPO Plan in which she was enrolled with respect to Dr. Xu's role as the assistant surgeon for her bilateral breast reduction procedure and remitted payment to Rowe.

324.    On or about September 12, 2025, the law firm of Gottlieb & Greenspan delivered an "Open Negotiation Notice" letter to Emblem on behalf of Rowe purporting to open negotiations with respect to further payment from Emblem for Dr. Rowe's services as the primary surgeon in connection with Patient 5's breast reduction surgery (the "September 12, 2025 Dr. Rowe ONN").

325.    On or about September 12, 2025, the law firm of Gottlieb & Greenspan delivered a second "Open Negotiation Notice" letter to Emblem on behalf of Rowe purporting to open negotiations with respect to further payment from Emblem for Dr. Xu's services as the assistant surgeon in connection with Patient 5's August 5, 2025 breast reduction surgery (the "September 12, 2025 Dr. Xu ONN" and, together with the September 12, 2025 Dr. Rowe ONN, the "September 12, 2012 OONs").

326.    In the September 12, 2025, Dr. Rowe ONN, Rowe "offered" to accept $270,000.00, representing ninety percent of their exorbitant $300,000.00 billed charge and 180% of the amount of Rowe's billed charge just a few months earlier, in additional payment for Dr. Rowe's services as the primary physician.

327.    In the September 12, 2025, Dr. Xu ONN, Rowe "offered" to accept another $270,000.00, representing ninety percent (90%) of their fraudulent and fictitious $300,000.00 billed charge, in additional payment for Dr. Xu's services as the assistant surgeon.

328.    The "offers" communicated in the September 12, 2025 ONNs were not made in good faith in accordance with the NSA.

329.    The "offers" communicated in the September 12, 2025 ONNs were based on Rowe's use of a fraudulent and fictitious billed charge.

330.    After delivering the two bad faith "offers" in the September 12, 2025 ONNs, neither Rowe nor their counsel made any effort to actually negotiate with Emblem over a reasonable and

realistic payment amount for either Dr. Rowe's services as the primary surgeon, or Dr. Xu's services as the assistant surgeon, for Patient 5's breast reduction surgery.

331.    Rowe had no interest or intention to negotiate in good faith with respect to either of the September 12, 2025 ONNs because they already intended, as part of their fraudulent scheme, to submit fraudulent information to each of the IDREs in order to procure two fraudulent awards in amounts far in excess of the value of Dr. Rowe's and Dr. Xu's respective services.

332.    Having determined by experience that the IDR process could be manipulated to obtain completely irrational awards from IDREs who were easily defrauded, Rowe, thereafter, fraudulently submitted two (2) separate IDR Proceedings to two different IDREs for the single procedure performed on Patient 5 – one with respect to Dr. Rowe's services and the other with respect to Dr. Xu's services. In this way, Rowe intended to, and in fact did, fraudulently induce each IDRE to award $220,000, resulting in a completely irrational award of $440,000 for a single breast reduction procedure.

333.    Accordingly, on or about October 29, 2025, Rowe commenced an IDR with respect to the Patient 5 Primary Surgeon Fraudulent Claim (the "Patient 5 Primary Surgeon IDR").

334.    Rowe's offer in the Patient 5 Primary Surgeon IDR was $220,000.00, representing approximately seventy-three percent (73%) of its "new" billed charge of $300,000, and nearly 150% of their recently doubled billed charge of $150,000, for Dr. Rowe's services as the primary surgeon.

335.    The Patient 5 Primary Surgeon IDR was assigned to C2C Innovative Solutions, Inc. ("C2C").

336.    Emblem responded to the Patient 5 Primary Surgeon IDR on or about December 2, 2025. In an attempt to mitigate its damages, Emblem offered to pay $76,979.99 for Dr. Rowe's

services as the primary surgeon, which it explained represented "the 80th Percentile FairHealth Rate."

337.    Emblem indicated in its IDR submission that its offer represented 2,273.30% of the $3,386.26 QPR, as compared to Rowe's offer which was 6,497% of the QPA.

338.    In support of its IDR submission in connection with the Patient 5 Primary Surgeon IDR, Emblem submitted a written statement and supporting documents.

339.    In its written statement, Emblem informed the IDRE, among other things, that Rowe's request in the September 12, 2025 Dr. Rowe OON of 90% of their billed charge was extremely high compared to all claims paid by Emblem since January 1, 2020, including the amounts Rowe had previously charged and been paid. Emblem explained: "Dr. Rowe used to request Single Case Agreements and were paid $25,500.00 in 2020-2021."

340.    Emblem's submission further informed the IDRE that Rowe:

> has a pattern of exploiting the NSA IDR process, even for elective, prescheduled procedures, because the NSA IDR offers the provider a potential opportunity to secure a reimbursement that is far in excess of what it would otherwise be entitled to receive.

341.    Emblem's submission further noted that Rowe "has not submitted any medical records or objective clinical documentation to demonstrate that the service rendered was more complex, medically necessary beyond the standard, or required enhanced skill." It further argued that:

> Without such documentation, assertions of increased complexity or necessity remain unsubstantiated. In this case, the surgeon failed to submit medical records or clinical documentation to the insurance plan to support the medical necessity, complexity, or extent of their involvement in this case. While the provider may have submitted records directly to the IDR entity, failing to provide them to the health plan violates the intent of the open negotiation period. Additionally, when the insurer cannot review the clinical basis of the service, the default basis for reimbursement must be the QPA, which is the statutorily preferred and most heavily weighted factor.

342.    Accompanying Emblem's submission was a seventeen-page, single spaced claims run showing the amounts billed to and paid by Emblem to other in-network providers for bilateral breast reduction surgeries in approximately 1,000 surgeries demonstrating a median rate of $5,142.84.

343.    In an award determination dated December 12, 2025, the IDRE accepted Rowe's offer in the Patient 5 Primary Surgeon IDR and determined that "the appropriate out-of-network rate" was $220,000 for Dr. Rowe's services as the primary surgeon.

344.    In support of its award, the IDRE stated that Rowe had "provided the following information:"

- A statement that the provider is "a small medical practice with few employees," allegedly "making their market share insignificant" and "plac[ing them] at a disadvantage when negotiating with health plans."

- A statement that the health plan is a "multi-billion dollar private company that serves over three million people in the geographic region."

- A statement that the "the facility where the services were rendered is an acute care hospital, with an advanced incorporation of robotics within its facility," that it "is designated as a primary stroke center" and that it "has a high case mix for surgery."

- An operative report documenting "that a 57-year-old female presented with a history of bilateral neck and back pain, bilateral inframammary intertrigo, bilateral macromastia, and thoracic kyphosis" and further documenting that she "underwent a bilateral breast reduction, panniculectomy, and a transversus abdominis plane block, and bilateral pectoralis nerve block."

- A statement that Rowe allegedly "attempted to negotiate a settlement; however [Emblem] did not respond to the request."

345.    The information that Rowe submitted to the IDRE was false, inaccurate and misleading.

346.    Rowe's private practice is not "small." It is a multi-million-dollar surgery mill comprised of numerous entities with seven (7) offices spanning three (3) states that perform hundreds, if not more, breast reductions every year.

347.    Nor are there "few employees." There were and are at least four plastic surgeons working in the practice: Dr. Rowe himself and three others: Dr. Pierce, Dr. Lisa F. Schneider, and Dr. Xu, not to mention para-medical staff, support staff, and other non-medical staff required to operate each of the seven locations on a day-to-day basis.

348.    Nor, for the same reason, is Rowe's market share minimal.

349.    Rowe's assertions that "the facility where the services were rendered is an acute care hospital, with an advanced incorporation of robotics within its facility," that it "is designated as a primary stroke center" and that it "has a high case mix for surgery," were equally deliberately misleading. Rowe was also aware that, as previously explained above, under the NYC PPO Plan, the facility/hospital charge was covered by Anthem/Empire Blue Cross and Blue Shield, and not by Emblem. The amount sought by Rowe in the IDR Proceeding did not include the hospital's charge. According, the hospital's purported expertise or case mix was entirely irrelevant.

350.    Rowe also misrepresented that, as a "small private practice," they had been unable to negotiate an in-network agreement with Emblem. Just to the contrary, when Emblem reached out to Rowe about becoming an in-network provider in 2021, Rowe had no interest because they were determined to be overpaid for routine breast reduction surgeries.

351.     It is likewise clear that Rowe misrepresented Patient 5's acuity. It is hardly surprising that Patient 5, like presumably most women who elect breast reduction, had large breasts (bilateral macromastia) and that, as a result, she experienced back and neck pain and "bilateral inframammary intertrigo" (i.e., a skin rash beneath her breasts caused from heat and friction). But none of those discomforts caused her life to be in danger and nothing about the surgery she elected to undergo with an out-of-network provider to address those discomforts remotely warranted a payment of $440,000.

352.     Furthermore, the IDRE's apparent reliance on the fact that Patient 5 also received a "panniculectomy" (essentially, a tummy tuck), a "transversus abdominis plane block" (anesthesia procedure), and "bilateral pectoralis nerve block" (ultrasound pain management procedure) was patently improper. Each of those procedures have their own CPT code and had nothing whatsoever to do with the proper payment amount for a breast reduction under CPT Code 19318.

353.     Rowe also blatantly misrepresented to the IDRE that they "attempted to negotiate a settlement" but that Emblem failed to respond. No such good faith effort to "negotiate a settlement" was made. Rather, Rowe dispatched their counsel to convey an ultimatum that Emblem pay 90% of Rowe's unconscionably inflated $600,000 billed charge, and counsel made clear that Rowe would not accept a penny less.

354.     Rowe also failed to disclose to the IDRE that they had entered into over one-hundred and fifty (150) contracts with Emblem in which they agreed accept $25,500 for the primary surgeon and $4,080 for the assistant surgeon for a bilateral breast reduction and that, when no SCA was entered into, Rowe had accepted the out-of-network benefit of under $10,000 in numerous breast reduction procedures they performed on NYC PPO Plan members.

355.    On or about October 30, 2025, Rowe commenced a second IDR Proceeding, this time with respect to the Patient 5 Assistant Surgeon Fraudulent Claim (the "Patient 5 Assistant Surgery IDR").

356.    Rowe's "offer" in the Patient 5 Assistant Surgeon IDR was also $220,000.00.

357.    The Patient 5 Assistant Surgery IDR was assigned to a different IDRE: Network Medical Review Company, Ltd. ("NMRC").

358.    Upon information and belief, Rowe did not inform NMRC that it had filed a separate IDR Proceeding for the primary surgeon which had been assigned to a different IDRE.

359.    Because of the massive volume of IDR Proceedings that Rowe was filing and Rowe's failure to disclose that they had filed two (2) separate IDR Proceedings for a single surgery that were before two (2) different IDREs, Emblem and the IDRE were deceived into believing that the Patient 5 Assistant Surgeon IDR was for a different breast reduction procedure than the one that was the subject of the Patient 5 Primary Surgeon IDR.

360.    In opposition to the Patient 5 Assistant Surgeon IDR, Emblem submitted a statement and various supporting documents.

361.    In its written submission, Emblem addressed each of the five (5) factors set forth in the NSA. With respect to the first factor, Emblem stated that Dr. Xu's "level of training, certifications, and score of services were comparable to multiple in-network plastic surgery providers credentialed at the same facility and within the same specialty." It further noted that "Without documentation, we have no evidence of superior outcomes, specialized expertise, or advanced procedural training that would justify a rate above the QPA." Emblem further argued that "The provider's case mix and complexity are typical plastic surgery cases performed at this

facility and quality of outcomes data has not been provided to us to support a premium reimbursement."

362.    In support of the foregoing assertions, Emblem included a printout showing that there were five hundred (500) in-network plastic surgery providers within 30 miles of Patient 5's residence in New York.

363.    With respect to the second factor, Emblem informed the IDRE that Rowe's practice:

> owns and operates at least 7 Plastic Surgery offices, reflecting a substantial business footprint and significant share of the regional plastic surgery market. Given the scale, the provider clearly has the administrative and financial capacity to engage in good faith contract negotiations with major insurance carriers. A provider of his size and experience cannot reasonably be considered disadvantaged in contract discussions. The provider's decision to remain out-of-network is therefore voluntary and should not justify higher reimbursement through the IDR process. It should also be noted that this member network has more than 500 participating plastic surgery providers within 30 miles of their home. (see attached report). The health plan maintains a robust and comprehensive network of participating plastic surgery specialists, with over 500 in-network providers available to this member. This demonstrates a significant market share and ample access to care within the service area. Given the extensive network availability, there is no basis for asserting limited access or network inadequacy. This member had numerous in-network options for plastic surgery services and could have obtained the same or comparable care from participating providers.

364.    Emblem's submission further argued that Patient 5's procedure:

> was a planned, elective procedure where the patient had the opportunity to choose a provider and has been repeatedly informed of the provider's out-of-network status. The member was made aware as early as January 14, 2025, that Rowe Plastic Surgery is a non-participating provider. In addition, in this case, either Rowe Plastic Surgery did not provide the member with the required Notice and Consent or the member refused and proceeded with out-of-network services anyway. All Explanations of Benefits (EOBs) issued to the member for prior services have clearly stated that the provider is OON and that payment was processed under the plan's out-of- network benefits.

365. Finally, Emblem's submission reminded the IDRE that: "Under the [NSA] and implementing regulations, billed charges are not a valid factor for determining the appropriate out-of-network payment amount" because, according to CMS guidance, they are "unilaterally set," "may not reflect actual market rates," and "are not indicative of reasonable value or cost." Emblem made the IDRE aware that Rowe "has increased his requested amount for CPT 19318 from $150,000 in 2024 to $270,000 in 2025 with no evidence of material changes in services, complexity, or circumstances."

366. In an award determination dated February 5, 2026, the IDRE in the Patient 5 Assistant Surgeon IDR accepted Rowe's offer and determined that Emblem should pay the completely irrational amount of $220,000 for Dr. Xu's services as the assistant surgeon.

367. In support of its determination, the IDRE in the Patient 5 Assistant Surgeon IDR stated that it weighed the QPA "equally with all credible, allowed additional information," and yet later acknowledged that it gave the QPA only "some weight."

368. Despite expressly acknowledging what Emblem had submitted with respect to the parties' history of entering into SCAs and Rowe's abuse of the IDR process as a substitute for negotiating a network contract, the IDRE stated that it gave "no weight" to this information. This is all the more inexplicable given the IDRE's acknowledgement that Rowe did not provide any information concerning their alleged efforts to negotiate or to illustrate that Emblem had allegedly failed to engage in any such efforts.

369. The IDRE's award also states that it gave "significant weight" to Patient 5's alleged acuity, as "evidenced by [Rowe's] submission of medical records." It did not, however, provide any information whatsoever on what those medical records were or how they supported awarding $220,000 for the assistant surgeon's services.

370. Furthermore, as already noted, bilateral breast reduction is a common, routine procedure, which Defendants themselves tout on their website and in their YouTube videos as something that can be done on an outpatient basis in one day. These patients have no meaningful acuity that could possibly justify Rowe's fraudulent billed charges. *Brain surgery* or *open heart surgery,* where patient acuity is surely a heightened concern in the surgical theatre, do not cost as much as the $440,000 that Rowe misled the IDREs to award for a breast reduction.

371. The IDRE's award further stated that it ascribed "significant weight" to Dr. Xu's "experience and training," as purportedly evidenced by a curriculum vitae (CV) that Rowe had submitted. For context, Dr. Xu was only one year out of his residency at the time the IDRE found his "experience and training" warranted Emblem paying Rowe $220,000 for Dr. Xu's assistance of another surgeon with a breast reduction.

372. In contrast, the IDRE ascribed "minimal weight" to the evidence that Emblem had submitted indicating that Patient 5 had over 500 equally qualified Emblem in-network plastic surgeons that she could have chosen, all within 30 miles of her home. The IDREs dismissal of this evidence, and decision to give it "minimal weight," is mothing short of completely irrational.

373. In short, through their improper manipulation of the IDR process and submission of false and misleading information in each of the IDR Proceedings, Rowe fraudulently obtained awards paying them $440,000 for a breast reduction procedure.

374. With respect to each of the eight (8) IDR proceedings discussed above, Emblem believes that Rowe misrepresented additional facts to the IDREs, but this information is in the exclusive possession of Rowe and the IDREs and was never provided to Emblem. When this information is disclosed, Emblem reserves the right to amend this Complaint.

**I.**

## AS AND FOR A FIRST CAUSE OF ACTION
### (Declaratory Relief Pursuant to 28 U.S.C. § 2201)

375.    Plaintiff repeats and realleges the allegations set forth above in Paragraphs 1 through 374 of the Complaint as if fully set forth herein.

376.    Section (c)(5)(E)(i)(I) of the NSA provides, in pertinent part, that "A determination of a certified IDR entity . . . . (I) shall be binding upon the parties involved, in the absence of a fraudulent claim or evidence of misrepresentation of facts present to the IDR entity involved regarding such claim . . ." 42 U.S.C. § 300gg-111(c)(5)(E)(i)(I).

377.    Defendants submitted fraudulent claims and misrepresented the facts to the IDREs, including in the IDR proceedings discussed above and in each of the IDR Proceedings listed in Exhibit A to this Complaint.

378.    In connection with those IDRs, Defendants exploited the *ex parte* nature of the IDR process by misrepresenting the facts, falsifying information, omitting material facts and information, and otherwise defrauding Emblem and the IDREs in order to fraudulently induce the IDREs to accept Defendants' irrationally exorbitant payment offers.

379.    Rowe knew that the amounts they were seeking dramatically exceeded the amounts they could expect to receive for their services from patients or Emblem in a competitive market. Indeed, Rowe knew that outside the NSA's IDR process, they had not been paid these amounts for treating NYC PPO Plan members.

380.    As discussed in detail above, in issuing the awards, the IDREs stated that they had relied on the fraudulent claims and the numerous misrepresentations and omissions of facts made to them by the Defendants.

381.    Because the IDRE awards were and are based upon fraudulent claims and were procured by misrepresentation of the facts to the IDRE's, they are not binding.

382.    There is an actual and justiciable controversy and dispute between Emblem and Rowe with respect to whether the IDR awards at issue are binding under the express terms of Section 5(E)(i)(I) of the NSA. Rowe contends the awards are binding while Emblem contends they are not binding.

383.    The parties require a declaratory judgment to clarify and determine whether the IDR awards are binding.

384.    Accordingly, Plaintiff prays for a judgment declaring and determining that the IDR awards above and in Exhibit A hereto were obtained through the submission of fraudulent claims and by misrepresentation of the facts submitted to the IDREs, and are not binding under Section (c)(5)(E)(i)(I) of the NSA.

**II.**

**AS AND FOR A SECOND CAUSE OF ACTION**
**(In the Alternatives, to Vacate the Awards)**

385.    Plaintiff repeats and realleges the allegations set forth above in Paragraphs 1 through 384 of the Complaint as if fully set forth herein.

386.    Section (c)(5)(E)(i)(II) of the NSA permits an IDR award to be vacated for any of the reasons described in paragraphs (1) through (4) of section 10(a) of title 9, commonly known as the Federal Arbitration Act ("FAA"), 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II).

387.    Subparagraph 1 of Section 10(a) of the FAA permits an arbitration award to be vacated where "the award was procured by corruption, fraud, or undue means." 9 U.S.C. § 10(a)(1).

388.    Subparagraph 3 of Section 10(a) of the FAA permits an arbitration award to be vacated where "the arbitrators were guilty of . . . any other misbehavior by which the rights of any party have been prejudiced."

389.    Subparagraph 4 of Section 10(a) of the FAA permits an arbitration award to be vacated where "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." Courts in this Circuit recognize that where, as here, the award is so completely irrational that it lacks support altogether or was made in manifest disregard of the law, it may be vacated under subparagraph 4 of Section 10(a) of the FAA. Vacatur is also proper where the award is contrary to public policy.

390.    Although the NSA expressly incorporates paragraphs (1) through (4) of Section 10(a) of the FAA, it does not incorporate any of the FAA's other sections or provisions, including on timing or procedures. Thus, the other sections of the FAA and their procedural requirements do not apply to this action.

391.    The IDREs received no evidence that rationally supported their awards to Rowe, including but not limited to an award of $440,000 for a breast reduction that Rowe themselves admit costs between $15,000 and $25,000.

392.    The IDREs undertook no analysis or investigation that rationally supported the awards rendered, especially when Rowe had regularly accepted a fraction of that amount in hundreds of breast reduction procedures they performed on Emblem insureds.

393.    The complete irrationality of the IDR awards is graphically illustrated by the awards to Rowe for the assistant surgeons. The IDREs ignored the CMS industry standard of 16%, along with the amounts paid by Emblem and accepted by Rowe in hundreds of breast reduction surgeries.

394.    The IDREs exceeded their powers by issuing awards that, for the reasons discussed above, were (i) so completely irrational that they lack support altogether, and (ii) were not rationally supported by any evidence in the parties' submissions. Upon information and belief, the IDREs awards are unprecedented.

395.    In addition, the awards at issue here cannot be reconciled with the QPA and effectively amount to an award of Rowe's billed charges, which is expressly prohibited by the NSA.

396.    The awards also assigned "no weight" or "minimal weight" to evidence concerning one or more of the five (5) "additional factors," in violation of the express commands of the NSA, including the hundreds of surgeries in which Rowe had agreed to accept the applicable rate for out-of-network benefits under the NYC PPO Plan and/or entered into over one-hundred and fifty (150) SCAs in which they agreed to accept $25,500 for the primary surgeon and/or $4,080 for the assistant surgeon. Accordingly, the IDREs also manifestly disregarded the law.

397.    The awards should be vacated because they are also contrary to public policy. Indeed, the awards have resulted in exactly the opposite of what the NSA was intended to achieve and will, if not vacated, dramatically raise the cost of medical care from out-of-network providers, especially for enrollees in the NYC PPO Plan.

398.    The NSA was not intended to allow an out-of-network provider who is performing elective, pre-scheduled surgery on a patient enrolled in a health plan with out-of-network benefits to completely nullify those benefits by scheduling the surgery at an in-network facility. The NSA was only intended in such a situation to address the charges of an out-of-network provider, like the anesthesiologist, whom the patient had not chosen and who unknowingly provided services on an out-of-network basis.

399.    Because the patients at issue are all enrolled in the NYC PPO Plan, the awards for all intents and purposes completely nullified the applicable benefit/rate for services performed by out-of-network providers under the NYC PPO Plan where no emergency or surprise existed. This will inevitably lead to multi-millions in added costs to pay Rowe's irrational charges and the charges of other out-of-network providers who follow Rowe's lead.

400.    Rowe's abusive practices, if allowed, will be copied by other out-of-network providers and will threaten the affordability of the NYC PPO Plan.

401.    Since adoption and enactment of the NSA, Defendants have fraudulently abused and manipulated the NSA's IDR process to channel elective and pre-scheduled out-of-network breast reduction procedures to in-network surgical facilities with the intention of submitting the inevitable payment dispute between Rowe and Emblem into the NSA's IDR process.

402.    In connection with those IDRs, Defendants have not only submitted and sought additional payments for the underlying fraudulent claims, they have also affirmatively misrepresented facts, falsified information, omitted material facts and information, and otherwise sought to defraud Emblem and the IDREs in order to fraudulently induce the IDREs to accept their completely irrational payment offers.

403.    Because of the *ex parte* nature of the IDR process, Emblem was not provided with a copy of, and had no opportunity to respond to, the false, inaccurate, and misleading information submitted by Rowe to each of the IDREs, thereby corrupting the integrity and fairness of the entire IDR process.

404.    Rowe knew that the amounts they were seeking dramatically exceeded the amounts they could expect to receive for their services from patients or Emblem in a competitive market.

Indeed, Rowe knew that they had not been paid or recovered these amounts for treating NYC PPO Plan members outside the NSA.

405.    As a result of the *ex parte* nature of the IDR process and Defendants' submission of knowingly false, inaccurate and misleading information to the IDREs, Emblem's rights with respect to a fair, reasonable, and just resolution of the payment disputes through the NSA's IDR process have been prejudiced.

406.    Because the IDR awards received by Defendants as a result of their fraudulent scheme were (i) premised upon fraudulent claims, (ii) procured by fraud and misrepresentation of the facts to the IDREs, (iii) completely irrational, (iv) based on the IDRE's manifest disregard of the applicable law and standards under the NSA, and (v) contrary to public policy, they should be vacated pursuant to section 10(a) of the Federal Arbitration Act, as incorporated by NSA section (c)(5)(E)(i)(II).

### III.

**AS AND FOR A THIRD CAUSE OF ACTION**
**(Violation of the New Jersey Insurance Fraud Prevention Act)**

407.    Plaintiff repeats and realleges the allegations set forth above in Paragraphs 1 through 406 of the Complaint as if fully set forth herein.

408.    The New Jersey Insurance Fraud Prevention Act ("IFPA") was enacted in order:

to confront aggressively the problem of insurance fraud in New Jersey by facilitating the detection of insurance fraud, eliminating the occurrence of such fraud through the development of fraud prevention programs, requiring the restitution of fraudulently obtained insurance benefits, and reducing the amount of premium dollars used to pay fraudulent claims.  N.J.S.A. 17:33A-2.

409.    Defendants violated the IFPA by submitting to Emblem the claims discussed above and listed in Exhibit A hereto because they knew the claims contained materially false and

misleading information, including that their billable charge for services under CPT Code 19318 was first $150,000 and later $300,000 for the primary surgeon, and approximately $45,000 to $300,000 for the assistant surgeon.

410. At the time they submitted the fraudulent claims to Emblem, Rowe knew that the claims were for fraudulent and exorbitantly high charges that did not reflect the amount they were actually charging and attempting to collect from patients. As a result of their practice of fee forgiving, the amounts Rowe was charging their patients were significantly less than the amount Rowe was misrepresenting to Emblem was their billable charge.

411. At the time they submitted the fraudulent claims to Emblem, Rowe knew that the amounts they sought were materially inflated, false, misleading, and fictitious.

412. At the time they submitted their claims to Emblem, Rowe knew that neither Emblem nor, upon information and belief, other insurers or self-pay patients pay hundreds of thousands of dollars for a bilateral breast reduction.

413. At the time they submitted their claims to Emblem, Rowe knew that their purported billable charge was a fictitious amount bearing no relationship to the market-based price and value of the services rendered by them, or the amounts paid to them by Emblem and, upon information and belief, by other insurers and self-pay patients.

414. Further, because the amounts billed by Rowe do not reflect their actual billable charge, upon information and belief they make no effort to collect this amount from patients after they receive payment from the patients' insurer, including Emblem. This includes not pursuing the purported balance due from patients.

415. At the time they submitted their claims to Emblem, Defendants knew that Emblem would not pay their exorbitant charges and, to perpetuate their fraud, they intended to file IDR

Proceedings misrepresenting, among other things, their billable charge for both the primary and assistant surgeons for a bilateral breast reduction.

416.    The filing of an IDR Proceeding, in which Rowe submitted fraudulent claims and misrepresented the facts to the IDREs, was part and parcel of Rowe's fraudulent scheme and violation of the IFPA.

417.    Upon information and belief, Rowe also misrepresented to the IDREs that their services were "unique" because they were using the short-scar or SPAIR techniques and/or that they possessed some special skill or expertise in performing breast reduction surgeries.

418.    At the time Rowe made the foregoing representations, Rowe knew they were materially false and misleading.

419.    At the time they submitted the fraudulent claims and false and misleading material information to the IDREs, Rowe knew that the claim amounts and the information purporting to support those amounts were materially false and misleading.

420.    As a result of Rowe's violation of the IFPA, Emblem suffered damages, including compensatory and treble damages, expenses and the costs of suit and attorneys' fees, all in an amount to be determined at trial.

## IV.

### AS AND FOR A FOURTH CAUSE OF ACTION
### (Unjust Enrichment)

421.    Plaintiff repeats and realleges the allegations set forth above in Paragraphs 1 through 420 as if fully set forth herein.

422.    Rowe knew that the payment amounts they were requesting from Emblem and the IDREs were inflated, unsupported by the facts and fictitious.

423.   Rowe knew that the amounts they were seeking dramatically exceeded the amounts they could expect to receive, or had received, for their services from patients or Emblem.

424.   Rowe misrepresented the facts and submitted false, misleading, and inaccurate information in order to induce the IDREs to award them payment amounts that greatly exceed the actual market value of the services they provided to Emblem's insureds.

425.   Rowe did so to exploit the IDR process and take advantage of the IDREs, so as to realize undue and unfair gains at Emblem's expense.

426.   As a direct and proximate result of the foregoing misconduct, the IDREs were induced to and did in fact render IDR determinations in Rowe's favor awarding them undue and unfair amounts that greatly exceed the market value of their services.

427.   Rowe thereby unjustly profited and were unjustly enriched at Emblem's expense.

428.   It would be against equity and good conscience to permit Rowe to retain, or to collect from Emblem, the unfair and excessive payment amounts they wrongfully induced the IDREs to award on account of their unfair, false, inflated and fictitious claims.

429.   Emblem has been damaged in the amount of the awards issued in Rowe's favor in the IDR Proceedings and the amounts paid by Emblem to the IDREs, in an amount to be determined at trial.

**V.**

**AS AND FOR A FIFTH CAUSE OF ACTION**
**(Common Law Fraud)**

430.   Plaintiff repeats and realleges the allegations set forth above in Paragraphs 1 through 429 of the Complaint as if fully set forth herein.

431.   As discussed fully above, Rowe submitted claims to Emblem seeking payment amounts ranging up to as much as $600,000 for bilateral breast reduction surgeries under CPT

Code 19318 on the following dates: July 4, 2024; May 24, 2024; February 19, 2025; February 22, 2025; June 5, 2025; June 5, 2025; August 7, 2025; August 7, 2025; August 13, 2025; and the dates of the claims listed above and in Exhibit A.

432.   Each of the claims was submitted to Emblem.

433.   At the time they submitted the fraudulent claims to Emblem, Rowe knew that the claims they were submitting were for fraudulent and exorbitantly high charges that did not reflect the amount they were actually charging and attempting to collect from the patients.

434.   As a result of their practice of fee forgiving, the amount Rowe was charging the patients was significantly less than the amount Rowe was representing to Emblem was their billable charge.

435.   At the time Rowe submitted each such claim to Emblem, Rowe knew that their purported billable charge for the primary surgeon and assistant surgeon was false, misleading and fictitious.

436.   Further, because the amounts billed by Rowe do not reflect their actual billable charge, upon information and belief they make no effort to collect this amount from patients after they receive payment from the patients' insurer, including Emblem. This includes not pursuing the purported balance due from patients.

437.   After Emblem properly paid each of the claims in accordance with the insureds' coverage for out-of-network services under the NYC PPO Plan, Rowe commenced an IDRE Proceeding.

438.   Besides submitting fraudulent claim amounts, Rowe also fraudulently misrepresented the material facts to the IDREs. The particulars concerning Defendants' material misrepresentations are alleged with specificity above. This information, however, is in the

exclusive possession of Rowe and cannot be alleged with additional specificity until there has been discovery.

439.    As discussed above, Rowe also failed to disclose material facts to the IDREs, including facts that were in their exclusive possession and/or were unknown to Emblem.

440.    Rowe knew that the fraudulent, false and misleading information they submitted to the IDREs would not be seen by Emblem and that Emblem would have no opportunity to rebut that information and demonstrate its falsity.

441.    The IDREs were thereby induced to accept the payment offers from Rowe, notwithstanding that they were based on Rowe's fraudulent and fictitious billed charges and the various misrepresentations of material facts and omissions alleged above.

442.    Rowe intentionally sought to induce reliance by the IDREs for the sole purpose of defrauding Emblem. It is Emblem who was the victim of Rowe's fraud and the real party in interest.

443.    Emblem reasonably and justifiably relied upon the integrity of the IDR Proceedings, including Rowe's statutory and common law obligations to submit truthful facts and information to the IDREs. The IDREs reasonably and justifiably relied upon Rowe's misrepresentations of material facts and omissions.

444.    In reliance on Rowe's statutory and common law obligations to submit truthful and accurate information to the IDREs, Emblem was misled to participate in the IDR Proceedings.

445.    As a direct and proximate result of the foregoing, Emblem has been damaged in an amount to be determined at trial.

446.    Rowe's actions were wanton, willful, malicious and taken in bad faith. Accordingly, Emblem is entitled to punitive damages in an amount of at least $50 million.

## VI.

### AS AND FOR A SIXTH CAUSE OF ACTION
### (Negligent Misrepresentation)

447.  Plaintiff repeats and realleges the allegations set forth above in Paragraphs 1 through 446 as if fully set forth herein.

448.  In the alternative, the false and misleading material representations and omissions set forth above in detail were incorrect and made negligently.

449.  Rowe knew or should have known that their representations were untrue and incorrect.

450.  Emblem and the IDREs reasonably and justifiably relied upon Rowe's misrepresentations and their statutory and common law obligations to submit truthful facts and information to the IDREs.

451.  As a direct and proximate result of the foregoing, Emblem was misled to participate in the IDR Proceedings and was damaged in an amount to be determined at trial.

**WHEREFORE**, Plaintiff prays for the following relief:

a.  A declaration that because the IDR awards in which the IDREs selected Rowe's offers were fraudulently procured, they are not binding;

b.  In the alternative, vacatur of the IDR awards, pursuant to 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II) and 9 U.S.C. § 10(a);

c.  Compensatory damages in an amount to be determined at trial, including but not limited to any awards paid and the fees and other amounts Emblem paid in the IDR Proceedings, plus punitive damages of at least $50 million;

d.  Damages under the IFPA in an amount to be determined at trial;

e.  The costs of this action, including reasonable attorneys' fees; and

f.  Such other and further relief as this Court deems just and proper.

Dated:  New York, New York
        March 27, 2026

                                                 Respectfully submitted,

                                                 TARTER KRINSKY & DROGIN LLP

                                               By: */s/ Juan-Olivo-Castro*
                                                   Juan Olivo Castro
                                                   1350 Broadway
                                                   New York, New York  10018
                                                   Tel.: (212) 216-1132
                                                   Email: jolivo@tarterkrinsky.com

                                                   *Attorneys for Plaintiff*
                                                   *EmblemHealth, Inc.*

**Exhibit A**

| CPT Code | IDR Award | DISP Number |
|----------|-----------|-------------|
| 19318 | $112,500.00 | DISP-791896 |
| 19318 | $112,500.00 | DISP-792130 |
| 19318 | $112,500.00 | DISP-792301 |
| 19318 | $112,500.00 | DISP-895000 |
| 19318 | $112,500.00 | DISP-1123893 |
| 19318 | $112,500.00 | DISP-1397338 |
| 19318 | $150,000.00 | DISP-1703465 |
| 19318 | $112,500.00 | DISP-1703480 |
| 19318 | $112,500.00 | DISP-1928977 |
| 19318 | $150,000.00 | DISP-1937014 |
| 19318 | $112,500.00 | DISP-2105074 |
| 19318 | $112,500.00 | DISP-2173239 |
| 19318 | $146,250.00 | DISP-2272933 |
| 19318 | $150,000.00 | DISP-3353641 |
| 19318 | $150,000.00 | DISP-3364655 |
| 19318 | $145,971.00 | DISP-4033478 |
| 19318 | $194,628.00 | DISP-4035800 |
| 19318 | $220,000.00 | DISP-4406988 |
| 19318 | $220,000.00 | DISP-4416327 |
| 19318 | $220,000.00 | DISP-4466639 |
| 19318 | $220,000.00 | DISP-4545922 |

**TOTAL:     $3,091,849.00**