**TARTER KRINSKY & DROGIN LLP**
Juan Olivo-Castro (Bar No. 370322021)
Howard Wolfson (*Pro Hac Vice*)
Terence K. McLaughlin (*Pro Hac Vice*)
1350 Broadway
New York, New York 10018
Tel.: (212) 574-0329
Email: jolivo@tarterkrinsky.com
hwolfson@tarterkrinsky.com
tmclaughlin@tarterkrinsky.com

*Attorneys for Plaintiff EmblemHealth, Inc.*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| EMBLEMHEALTH, INC.,<br><br>Plaintiff,<br><br>-against-<br><br>NORMAN M. ROWE, M.D., NORMAN M. ROWE, M.D. PLLC, NORMAN M. ROWE MD OF NEW JERSEY LLC, ROWE PLASTIC SURGERY OF NEW JERSEY LLC, and EAST COAST PLASTIC SURGERY PLLC PA,<br><br>Defendants. | Case No. 2:26-cv-3311 (SDW) (MAH) |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AND TO STAY DISCOVERY**

Table of Contents

Page

PRELIMINARY STATEMENT ........ 1

STATEMENT OF FACTS ........ 6

A. Rowe ........ 6

B. Rowe Unnecessarily Schedules Reductions At In-Network Hospitals ........ 7

C. The NYC PPO Plan ........ 7

D. The NSA Was Enacted To Curb Abusive Billing Practices By Out-Of-Network Providers ........ 8

E. The IDR Process ........ 10

F. The NSA Was Established To Achieve Reasonable Compensation Roughly Approximating Average In-Network Rages ........ 11

G. Rowe Has Systematically Abused The NSA's IDR Process ........ 12

MOTION TO DISMISS STANDARD ........ 14

I. THE COURT HAS SUBJECT MATTER JURISDICTION ........ 15

II. ROWE'S MOTION TO DISMISS COUNT I SHOULD BE DENIED ........ 18

III. THE SECOND CAUSE OF ACTION SHOULD NOT BE DISMISSED ........ 20

A. The Complaint Alleges The Awards Are Completely Irrational ........ 20

B. The Awards Violate Public Policy ........ 22

C. The Awards Were Procured By Fraud ........ 24

D. The Complaint Is Not Procedurally Defective ..................... 27

E. The Noerr-Pennington Doctrine Does Not Apply ................. 28

F. The Complaint Is Not Subject To Dismissal As A Group Pleading ........................................................ 29

IV. THE MOTION TO DISMISS COUNTS III–VI SHOULD BE DENIED .......................................................... 31

A. Plaintiff's State Law Claims Are Not Preempted By The NSA ...................................................... 31

B. The Complaint Adequately Alleges A Cause Of Action For Violation Of The New Jersey Insurance Fraud Prevention Act ......................................................... 33

C. The Cause Of Action For Unjust Enrichment Should Not Be Dismissed ...................................................... 36

D. The Fifth And Sixth Causes Of Action For Fraud And Negligent Misrepresentation Should Not Be Dismissed ....... 37

E. Dr. Rowe Is Properly Named As a Defendant ....................... 38

V. THE REQUEST TO STAY SHOULD BE DENIED ...................... 39

CONCLUSION ......................................................................................... 40

`

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adam v. Barone*,
2023 WL 3058724 (D.N.J. Apr. 24, 2023) ..... 38

*Aetna Health, Inc. v. Radiology Partners, Inc.*,
2026 WL 155164 (M.D. Fla. Apr. 15, 2026) ..... 27

*Aetna Health Inc. v. Radiology Partners, Inc.*,
24-cv-1343-BJD-LLL, Order dated April 16, 2026
(Docket No. 105) ..... 33

*Akishev v. Kapustin*,
23 F. Supp. 3d 440 (D.N.J. 2014) ..... 39

*Am.. Specialty Health Grp., Inc. v. Ass'n of N.J. Chiropractors, Inc.*,
2021 WL 12101070 (D.N.J. Jan. 22, 2021) ..... 29

*Amphastar Pharms. Inc. v. Momenta Pharms.*,
850 F.3d 52, 56 (1st Cir. 2017) ..... 8

*Anthem Blue Cross & Heath Ins. Co. v. HaloMD LLC*,
2026 WL 982629 (C.D. Cal. Apr. 9, 2026) ..... 27

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..... 14

*Badgerow v. Walters*,
596 U.S. 1 (2022) ..... 17

*In re Burlington Coat Factory Secs. Litig.*,
114 F.3d 1410 (3d Cir. 1997) ..... 35

*Bussinelli v. Twp. Of Mahwah*,
2024 WL 3755914 (D.N.J. Aug. 12, 2024) ..... 30

*Cheminor Drugs, Ltd. v. Ethyl Corp.*,
168 F.3d 119 (3d Cir. 1999) ....................29

*Conn. Gen. Life Ins. Co. v. True View Surgery Center One, L.P.*,
128 F. Supp. 3d 501 (D. Conn. 2015)....................12

*Constitution Party of Pennsylvania v. Aichele*,
757 F.3d 347 (3d Cir. 2014) ....................14

*Coyle v. Hornell Brewing Co.*,
2009 WL 1652399 (D.N.J. June 9, 2009)....................40

*Dluhos v. Strasberg*,
321 F.3d 365 (3d Cir. 2003) ....................19

*Edmond v. State*,
2026 WL 194495 (D.N.J. Jan. 26, 2026)....................14

*Est. of Gleiberman v. Hartford Life Ins. Co.*,
94 F. App'x 944 (3d Cir. 2004) ....................36

*Exxon Shipping Co. v. Exxon Seamen's Union*,
11 F. 3d 1189 (3d Cir. 1993) ....................23

*Feiler v. N.J. Dental Ass'n*,
191 N.J. Super. 426 (Sup. Ct. 1983), *aff'd,* 199 N.J. Sup 363 (App. Div. 1984) ....................12

*France v. Bernstein*,
43 F.4th 367 (3d Cir. 2022) ....................26

*Frederico v. Home Depot*,
507 F.3d 188 (3d Cir. 2007) ....................35

*Galicki v. New Jersey*,
2015 WL 3970297 (D.N.J. June 29, 2015)....................30

*Gelis v. Bayerische Motoren Werke Aktiengesellschaft*
2018 WL 6804506 (D.N.J. Oct. 30, 2018) ....................25

*Gerald Chamales Corp. v. Oki Data Ams., Inc.*,
247 F.R.D. 453 (D.N.J. 2007)....................39

*Goldman v. Citigroup Glob. Market Inc.*,
834 F.3d 242 (3d Cir. 2016) ....................17

*Gov't Emps. Ins. Co. v. Zuberi*,
2017 WL 4790383 (D.N.J. Oct. 23, 2017) ....................34

*GPS of New Jersey MD P.C. v. Aetna, Inc.*,
2024 WL 414042 (D.N.J. Feb. 5, 2024) ....................27

*Guardian Flight, L.L.C. v. Med. Evaluators of Tex., ASO, L.L.C.*,
140 F.4th 613 (5th Cir. 2025) ....................26

*Gurjal v. BMW of N. Am., LLC*,
2022 WL 3646627 (D.N.J. Aug. 23, 2022) ....................36

*Horizon Blue Cross Blue Shield of N.J. v Transitions Recovery Program*,
2015 WL 8345537 (D.N.J. Dec. 8. 2015) ....................34

*JD Glob. Sales, Inc. v. Jem D Int'l Partners, LP*,
2023 WL 4558885 (D.N.J. July 17, 2023) ....................30

*Jordan v. N.J. Dep. of Corrections*,
881 F. Supp. 947 (D.N.J. 1995) ....................18

*K.S.D. v. Ryan*,
2024 WL 180798 (D.N.J. Jan. 17, 2024) ....................18

*Kaiser Found. Health Plan, Inc. v. Medquist, Inc.*,
2009 WL 961426 (D.N.J. Apr. 8, 2009) ....................25

*Kenney v. M2 Worldwide, LLC*,
2013 WL 3508564 (D.N.J. Jul. 11. 2013) ....................38

*Landis v. N. Am. Co.*,
299 U.S. 248 (1936) ....................40

*Lincoln Na'l. Life Ins. Co. v. Schwarz*,
2010 WL 3283550 (D.N.J. Aug. 18, 2010) ....................34

*Lopez v. Law Offices of Faloni & Assocs., LLC*,
2017 WL 2399083 (D.N.J. June 2, 2017) ....................14

*Ludwig Hanold Mfg. Co. v. Fletcher*,
405 F. 2d 1123 (3d Cir. 1969) ........................................................................21

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)........................................................................................31

*Mann v. Brenner*,
375 F. App'x. 232 (3d Cir. 2010) ...................................................................40

*Marmet Health Care Ctr., Inc. v. Brown*,
565 U.S. 530 (2012)........................................................................................33

*Maryland v. Louisiana*,
451 U.S. 725 (1981)........................................................................................32

*McMahon v. Volkswagen Aktiengesellchaft*,
2023 WL 4045156 (D.N.J. Jun. 16, 2023)......................................................29

*Med-Trans Corp. v. Cap. Health Plan, Inc.*,
700 F. Supp. 3d 1076 (M.D. Fla. 2023), *aff'd sub nom. Reach Air Servs. LLC v. Kaiser Found. Health Plan, Inc.*, 160 F.4th 1110 (11th Cir. 2025)...........................................................................................19

*Metric Inv., Inc. v. Patterson*,
101 N.J. Super. 301 (App. Div.1968) ..............................................................38

*Modern Orthopaedics of NJ v. Premera Blue Cross*,
2025 WL 3063648 (D.N.J. Nov. 3, 2025) .......................................................16

*U.S. ex. rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*,
812 F.3d 294 (3d Cir. 2016) ...........................................................................35

*Neuroshield Network SE, LLC v. S&S Healthcare Strategies*,
2026 WL 743000 (N.D. Ga. Mar. 16, 2026) ...................................................16

*In re No Surprises Act Cases*,
2:25-cv-14860 (ES) (SDA)...............................................................................18

*Norman Maurice Rowe, M,D., M.H.A., LLC v. Aetna Life Ins. Co.*,
No. 23-civ-8527, 2025 WL 692051 (S.D.N.Y. Mar. 3, 2025) .........................2, 6

*Nutrishare, Inc. v. Conn. Gen. Life Ins. Co.*,
2024 WL 1028351 (E.D. Ca. Mar. 13, 2014)...................................................12

*Nype v. Sam*,
2024 WL 129803 (D.N.J. Jan. 11, 2014)....................25

*Oberwager v. McKechie, Ltd.*,
351 F. App'x 7082 (3d Cir. 2009)....................28

*Paek v. Atty Gen.*,
793 F. 3d 330 (3d Cir. 2015)....................19

*Parker Precision Prods. Co. v. Metro. Life Ins. Co.*,
407 F.2d 1070 (3d Cir.1969)....................38

*Pontrelli v. MonaVie, Inc.,*
2014 WL 4105417 (D.N.J. Aug. 19, 2014)....................36

*PMA Cap. Ins. Co. v. Platinum Underwriters Bermuda, Ltd.*,
659 F. Supp. 2d 631 (E.D. Pa. 2009)....................21

*Prima v. Darden Rests., Inc.*,
78 F. Supp. 2d 337 (D.N.J. 2000)....................36

*Pulsiver v. United States*,
601 U.S. 124 (2024)....................5, 19

*Reach Air Servs. LLC v. Kaiser Found. Health Plan, Inc.*,
160 F.4th 1110 (11th Cir. 2025)....................20, 33

*In re Rockefeller Propes. Inc. Sec. Litig.*,
311 F. 3d 198 (3d Cir. 2002)....................25

*In re Schering Plough Corp. Intron/Temodar Consumer Class Action*,
678 F.3d 235 (3d Cir. 2012)....................15

*Specialtycare Inc. v. Aetna, Inc.*,
2025 WL 3719227 (M.D. Pa. Dec. 23, 2025)....................25

*Stroehmann Bakeries, Inc. v. Loc. 776, Int'l. Bhd. of Teamsters*,
969 F. 2d 1436 (3d Cir. 1992)....................22

*Swift Indus. Inc. v. Botany Indus., Inc.*,
466 F. 2d 1125 (3d Cir. 1972)....................5, 21

*T.V. Seshan, M.D., PC v. Aetna, Inc.*,
2026 WL 867151 (S.D.N.Y. Mar. 20, 2026) ........................................23

*Takeda Pharm. Co. Ltd. v. Zydus Pharm. (USA) Inc.*,
358 F. Supp. 3d 389 (D.N.J. 2018) ........................................29

*Tanner v. U.S.*,
483 U.S. 107 (1987) ........................................38

*Teamsters Loc. 177 v. United Parcel Serv.*,
966 F.3d 245 (3d Cir. 2020) ........................................17

*Thomas v. Williams*,
2024 WL 2795895 (D.N.J. May 31, 2024) ........................................38

*Twp. of Bordentown, NJ v. Fed. Energy Regul. Comm'n*,
903 F.3d 234 (3d Cir. 2018) ........................................19

*U.S. Futures Exch., L.L.C. v. Bd. of Trade of the City of Chi., Inc.*,
953 F.3d 955 (7th Cir. 2020) ........................................29

*Udeen v. Subaru of Am., Inc.*,
378 F. Supp. 3d 330 (D.N.J. 2019) ........................................39

*Union Trust Co. v. Md. v. Wakefern Food Corp.*,
1989 WL 120756 (D.N.J. Sept. 8, 1989) ........................................38

*United Healthcare Servs., Inc. v. Teva Pharm. USA, Inc.*,
2023 WL 6558058 (D.N.J. May 11, 2023) ........................................39

*United States v. Milchin*,
128 F. 4th 199 (3d Cir. 2025) ........................................19

*Verizon Pennsylvania, LLC v. Commc'ns Workers of Am., AFL-CIO, Loc 13000*,
13 F.4th 300 (3d Cir. 2021) ........................................21

*Virginia Sur. Co. v. Macedo*,
2011 WL 1769858 (D.N.J. May 6, 2011) ........................................34

*VRG Corp. v. GKN Realty Corp.*,
135 N.J. 539 (N.J. 1994) ........................................36

*W.R. Grace & Co. v. Loc. Union 759, Int'l. Union of United Rubber, Cork, Linoleum & Plastic Workers of Am.*, 461 U.S. 757 (1983) ........ 22

*Walsh Sec. Inc. v. Cristo Prop. Mgmt, Ltd.*, F. Supp. 2d 523 (D.N.J. 1998) ........ 39

*Welch Foods, Inc. v. Gen. Teamsters, Loc. Union No. 397*, 2025 WL 1912352 (3d Cir. July 11, 2025) ........ 23

*Worldwide Aircraft Servs. Inc. v. Freedom Life Ins. Co. Am.*, No. 25-cv-1158, 2025 WL 3551397 (M.D. Fla. Dec. 11, 2025) ........ 17

*Yanes v. Minute Maid Co.*, 2006 WL 1207992 (D.N.J. May 3, 2006) ........ 38

*Yu-Chin Chang v. Upright Fin. Corp.*, 2020 WL 473649 (D.N.J. Jan. 28, 2020) ........ 30

**Statutes**

42 U.S.C. § 300gg-111(a)(1)(C)(iv)(I) ........ 10

42 U.S.C. § 300gg-111(c)(1)(A) ........ 10

42 U.S.C. § 300gg-111(c)(1)(B) ........ 10

42 U.S.C. § 300gg-111(c)(4)(F) ........ 10

42 U.S.C. § 300gg-111(c)(5)(B) ........ 11

42 U.S.C. § 300gg-111(c)(5)(D) ........ 11

42 U.S.C. § 300gg-111(c)(5)(E)(i)(I) ........ 5, 15

42 U.S.C. § 300gg-111(c)(5)(E)(i)(I)&(II) ........ 5

42 U.S.C. § 300gg-111-139 ........ 1

*How Doctors Cashed In on a Consumer Protection Law*, N.Y ........ 1

**Other Authorities**

45 C.F.R. § 149.510(b)(2)(i) ........ 12

45 C.F.R. 149.510(c)(4)(ii)(A) ....................12

N.J.S.A. 17:33A-4(a)(1)....................33

H.R. Rep. No. 116-615 ....................3, 8, 9

Social Security Act Section 1848(i)(2)(B)....................2

October 20, 2021 Letter from Frank Pallone, Jr.; available at: Pallone Murray No Surprises Act IFR Comment Ltr 10.20.212.pdf ....................12

http://nsa-idr.cms.gov/paymentdisputes/s/....................26

https://normanrowemd.com/how-much-does-breast-reduction-surgery-cost-a-detailed-look/)....................1

## PRELIMINARY STATEMENT

In the words of the *New York Times*, "[a] law meant to end surprise medical billing accidentally created a multibillion dollar industry that is making doctors richer."[1] Nobody more so than Dr. Norman Rowe.

This action arises under the explicit terms of the Federal No Surprise Act, 42 U.S.C. § 300gg-111-139 (the "NSA"). The action challenges completely irrational awards Defendants "Rowe" obtained in so-called Independent Dispute Resolution Proceedings ("IDR") by misrepresenting the facts to Independent Dispute Resolution Entities ("IDREs"). To illustrate the complete irrationality, the IDREs awarded up to $440,000 for breast reductions Rowe admit patients ***"can expect to pay on average, anywhere from $15,000 to $25,0000 for."*** (https://normanrowemd.com/how-much-does-breast-reduction-surgery-cost-a-detailed-look/) (emphasis added) (last visited on March 18, 2026.) (Subsequent to the filing of the Complaint, Rowe revised his website to state $18,000 to $28,000.)

Prior to misusing the NSA, Rowe had filed literally hundreds of actions against insurers unsuccessfully demanding exorbitant amounts when their surgical

[1] *See* Sarah Kliff and Margot Sanger-Katz, *A $440,000 Breast Reduction: How Doctors Cashed In on a Consumer Protection Law*, N.Y. Times (Apr. 22, 2026). (A copy of the article is attached to the accompanying Declaration of Juan Olivo, Esq. as **Exhibit "A."**)

mill performed routine breast reduction surgery. In threatening to impose sanctions, Judge McMahon commented on the:

> Numerous cases brought by plastic surgeon Norman Rowe against various insurers [based on] Rowe's exorbitant fees for plastic surgery be performed as an out-of-network provider.

*Norman Maurice Rowe, M,D., M.H.A., LLC v. Aetna Life Ins. Co.*, No. 23-civ-8527, 2025 WL 692051, at *1 (S.D.N.Y. Mar. 3, 2025).

The Emblem insureds Rowe treated were enrolled in the GHI Comprehensive Benefits Plan for City of New York Employees and Retirees (the "NYC PPO Plan"), a PPO with both in and out-of-network benefits. From 2019 thru mid-2021, based upon Dr. Rowe's misrepresentation that he and his colleagues were the only breast surgeons in this geographic area using an allegedly unique short-scar technique, Emblem entered into over one-hundred and fifty (150) Single Case Agreements ("SCAs")[2] with Rowe. In the SCAs, Emblem agreed to pay, and Rowe agreed to accept, $25,500 for the primary surgeon and $4,080[3] for the assistant surgeon (if

---

[2] A Single Case Agreement (SCAs) is a one-time, patient specific settlement agreement negotiated between Emblem and an out-of-network provider for a specific service. SCAs are used in situations where, for example, there is no in-network provider who can perform the services at issue, or an out-of-network provider has a special expertise. In a SCA, Emblem and the out-of-network provider agree in advance on the fee that will be paid in lieu of the Plan's benefit amount, and the provider further agrees not to balance bill the patient.

[3] The $4,080 represented 16% of the primary surgeon's amount, which is the Medicare guideline under Section 1848(i)(2)(B) of the Social Security Act.

needed) for a breast reduction in lieu of the NYC PPO Plan benefit amount. Emblem stopped entering into SCA's with Rowe, however, when in mid-2021 Rowe was unable to substantiate that they were the only provider using this purported "unique" technique, which they were not. Thereafter, in hundreds of breast reductions, Rowe accepted the NYC PPO Plan benefit amount for an out-of-network provider, which was between $6,000 and $10,000. Rowe did not (and does not) balance bill patients for the difference between their fictitious "billable charge" and the benefit amount paid under the NYC PPO Plan.

This all changed after Congress enacted the NSA. The NSA was intended to address "surprise bills" and reduce the healthcare costs from out-of-network providers. One example is when a patient is suffering from a medical emergency and receives treatment at the emergency room, where the on-call physician may not be in the patient's health care network. Another example is when an out-of-network provider renders services to a patient at an in-network hospital, and the patient "unknowingly" receives treatment from an ancillary provider who is out-of-network, like the anesthesiologist or radiologist. *See* H.R. Rep. 116-615, at 51. (The IDREs and courts have not limited application of the NSA in this situation to cases where the services were unknowingly provided by the out-of-network provider.) Rowe could have scheduled the breast reductions at one of the many out-of-network surgical facilities they had access to in New York and New Jersey, including Dr.

Rowe's own facility. They instead scheduled the procedures at an in-network hospital, notwithstanding that Rowe's website states that this will increase the cost of the procedure, so they could misuse the NSA. (Compl. ¶ 24 (citing https://normanrowemd.com/how-much-does-breast-reduction-surgery-cost-a-detailed-look/).)

Rowe billed the patients (and Emblem) up to an astounding $600,000 for a routine breast reduction. After being paid the applicable benefit amount under the NYC PPO Plan, Rowe commenced IDR Proceedings under the NSA. Those proceedings included *ex parte* submissions, including an offer, by each side to the IDREs. The IDREs then selected one of the two offers. Although Emblem did not receive Rowe's *ex parte* submissions, based upon the IDREs' decisions, Rowe plainly submitted false, misleading, incomplete and knowingly inaccurate information to the IDREs. The IDREs awarded completely irrational amounts as high as $440,000 for a procedure Rowe admits costs between $15,000 and $25,000.

The impact of these obscene awards will be borne by the hundreds of thousands of New York City employees and retirees enrolled in the NYC PPO Plan, whose premiums will increase as a result. As discussed below, Rowe's Motion should be denied because:

First, the Court has subject matter jurisdiction because this action arises under the clear and unambiguous provisions in the NSA. *See* 42 U.S.C. § 300gg-111(c)(5)(E)(i)(I)&(II).

Second, Rowe's Motion fails to address the First Cause of Action, and that the NSA explicitly provides that a determination by an IDRE "shall be binding upon the parties involved, in the absence of a fraudulent claim or evidence of misrepresentation of facts presented to the IDR entity involved regarding such claim . . ." 42 U.S.C. § 300gg-111(c)(5)(E)(i)(I). If binding in the absence of misrepresentation of the facts to the IDR entity, then an award is necessarily not binding where the facts were misrepresented. Any other construction would render Section (c)(5)(E)(i)(I) meaningless. *See Pulsiver v. United States*, 601 U.S. 124, 143, (2024) ("When a statutory construction 'render[s] an entire subparagraph meaningless' . . . the canon against surplusage applies with special force.") (*quoting Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 128, (2018).) A non-binding arbitration award has no force of law and can neither be confirmed nor vacated.

Third, the Complaint's Second Cause of Action alternatively alleges that the IDRE awards are subject to vacatur on multiple grounds under the NSA, which incorporates Section 10(a) of the Federal Arbitration Act ("FAA"). Rowe's Motion studiously ignores the allegations in the Complaint (and the caselaw) holding that an arbitration award may be vacated when it is completely irrational. *See Swift Indus.*

*Inc. v. Botany Indus., Inc.*, 466 F. 2d 1125, 1130 (3d Cir. 1972). Rowe's Motion similarly fails to address the Second Cause of Action's allegations seeking vacatur on grounds that the awards also violate public policy.

With respect to the only ground for vacatur they do address – fraud – Rowe argues the Complaint fails to satisfy Rule 9(b). They are wrong; at least ten separate misrepresentations are pled. Moreover, where the facts are within the exclusive possession of the party who made the misrepresentations, as they are here, the standard under Rule 9(b) is relaxed. The Complaint's allegations clearly provide Rowe with notice of the claims against them.

Finally, the state law causes of action, over which the Court has supplemental jurisdiction, are not preempted and state causes of action as demonstrated below.

## STATEMENT OF FACTS

The following facts must be accepted as true for purposes of this Motion.

**A. Rowe:** Dr. Rowe provides plastic surgery services, including breast reductions, to patients in New York, New Jersey and Florida. Dr. Rowe owns, manages, operates and controls each of the Defendants, and employs at least three other surgeons who perform hundreds of breast reductions per year. (Compl. ¶¶ 21-22.) Rowe's billboards appear on major highways and roads throughout New York and New Jersey, claiming that "Breast Reduction [is] COVERED BY INSURANCE." (Compl. ¶ 23.)

As Dr. Rowe states on YouTube, breast reduction surgery is a "very common" and "routine" procedure, representing "one of the top ten procedures performed by plastic surgeons in the United States." (Compl. ¶ 24.) Rowe also informs prospective patients that having a breast reduction done in an ambulatory surgery center minimizes the fees because "[h]ospitals usually charge more if you have to use them." (*Id*. ¶ 24.)

**B. <u>Rowe Unnecessarily Schedules Reductions At In-Network Hospitals</u>:** If Rowe performed reductions at an out-of-network ASC, including their own fully accredited operating room, the procedures would not be eligible for the NSA's IDR process. Notwithstanding that the cost will be higher, by pre-scheduling routine breast reductions at an in-network hospital, Rowe manufactures a basis to access the NSA's IDR process. (*Id*. ¶¶ 25-30.)

**C. <u>The NYC PPO Plan</u>:** The awards at issue all concern NYC PPO Plan members. The NYC PPO Plan provides both in-network and out-of-network benefits to New York City employees, retirees and their dependents at rates critical to maintaining affordable premiums for NYC PPO Plan members. (*Id*. ¶ 33.) The out-of-network benefit varies depending on whether the insured is covered by certain riders and their applicable deductible and copayment. The benefit for a bilateral breast reduction performed by an out-of-network provider is under $10,000. (*Id*. ¶ 34.) When NYC PPO Plan members pre-schedule breast reduction surgeries with

Rowe, both Rowe and the member know the amount of benefits that will be reimbursed to the plan member (and paid to Rowe). This allows NYC PPO Plan members to decide whether to have the surgery performed by Rowe instead of by one of the numerous in-network plastic surgeons. (*Id.* ¶ 35.)

**D. <u>The NSA Was Enacted To Curb Abusive Billing Practices By Out-Of-Network Providers</u>:** Health plans contract with a network of health care providers from whom their members may obtain "in-network" care. Such contracts govern the rate for the services and prohibit the participating providers from balance billing the patients directly for the difference between the contract rate and their billable charges. Generally, patients receive more affordable health care coverage when receiving treatment from in-network providers. (*Id.* ¶ 37.) Enrollees in the NYC PPO Plan can also obtain treatment from out-of-network providers. Because out-of-network providers are not bound by contractual billing limitations, patients typically pay more when they elect to receive care from out-of-network providers. (*Id.* ¶ 38.)

There are situations in which a patient has no ability to choose between in- and out-of-network care. One example is when the patient receives treatment in the emergency room, where the on-call physician may not be in the patient's health plan's network. (*Id.* ¶ 39.) Another example is when a patient visits an in-network hospital but ***"unknowingly"*** also receives services from an out-of-network physician, such as an anesthesiologist, radiologist or some other ancillary service provider. H.R. Rep. 116-615,

at 51. In these "[s]ituations . . . [the] patients have little or no control over whether a provider is in or out-of-network [.]" (*Id.*; Compl. ¶ 40.) Prior to the enactment of the NSA, surprise billing providers were able to "charge amounts for their services that ... result[ed] in compensation far above what is needed to sustain their practice" because patients lacked the ability "to meaningfully choose or refuse care." (H.R. Rep. No. 116-615 at 53; Compl. ¶ 43.) Surprise billing providers reaped massive profits by issuing surprise medical bills to patients and had little incentive to contract with health plans to offer more affordable health care services to American consumers. (Compl. ¶ 44.) This "market failure" was having "devastating financial impacts on Americans and their ability to afford needed health care." (H.R. Rep. No. 116-615 at 52; Compl. ¶ 45.) In response, Congress enacted the NSA to ensure that patients shall bear no more financial obligation to an out-of-network provider for a "surprise" bill than the patient would if the service had been rendered by an in-network provider. (Compl.¶ 48.)

Congress also provided a mechanism for patients and out-of-network providers to opt out of the NSA where the patient knowingly elects to receive non-emergency services from an out-of-network provider. (*Id.* ¶¶ 50-52.) Section 132(d) provides that the provider can provide the patient, at least 72 hours in advance of the date on which the non-emergency services are rendered, a copy of a written Notice and Consent Form under which the patient can waive the NSA. (*Id.* ¶ 52.) Rowe could have obtained a signed NSA Notice and Consent Form from every Emblem member on

whom they performed a breast reduction. Because doing so would have prevented Rowe from pursuing their fraudulent scheme, Rowe either did not provide the form to the patients or mislead the patients not to sign it by failing to inform them that Rowe had no intention of balance billing them. (*Id.* ¶ 53.)

**E. <u>The IDR Process</u>:** When a health plan receives a claim for out-of-network services subject to the NSA, it must make an initial payment or issue a notice of denial of payment within 30 days. *See* 42 U.S.C. § 300gg-111(a)(1)(C)(iv)(I). (Compl. ¶ 56.) If the provider is dissatisfied with the initial payment, it may initiate open negotiations with the health plan within thirty (30) business days of the initial payment or notice of denial. 42 U.S.C. § 300gg-111(c)(1)(A). After initiating open negotiations, the provider must attempt in good faith to negotiate a resolution with the health plan during the open negotiation period. (Compl. ¶¶ 57-58*)* If "the open negotiations . . . do not result in a determination of an amount of payment for [the] item or service," and the patient did not opt out of the NSA's balance billing protections pursuant to the NSA Notice and Consent Form, the provider may initiate the IDR process through a Federal website called the IDR Portal. *See* 42 U.S.C. § 300gg-111(c)(1)(B); 45 C.F.R. § 149.510(b)(2)(i). (Compl. ¶¶ 59-63.)

After the IDR process is initiated, the parties select, or HHS appoints, an IDRE. 42 U.S.C. § 300gg-111(c)(4)(F). IDREs are private entities who apply to become certified to conduct IDR Proceedings. (Compl. ¶¶ 65-67.) The provider and

health plan then each submit an offer, along with supporting information, and the IDRE selects one party's offer as the out-of-network rate. (*Id.* ¶ 68.) 42 U.S.C. § 300gg-111(c)(5)(B).) The submissions to the IDRE are made on an *ex parte* basis so that neither side sees the other side's submission, much less has the opportunity to rebut or address any misleading or inaccurate information therein. As such, it is a process literally rife for fraud. (Compl. ¶ 69.)

**F. <u>The NSA Was Established To Achieve Reasonable Compensation Roughly Approximating Average In-Network Rates</u>:** To fully drive home its goal to curb out-of-network providers' inflated "billed charges, the NSA states that a provider's "billed charge" may not be considered by an IDRE. 42 U.S.C. § 300gg-111(c)(5)(D). (Compl. ¶ 70.) Rather, the NSA and its implementing Rules limit the IDRE's consideration to the so-called Qualifying Payment Amount ("<u>QPA</u>") and five additional considerations: (a) the provider's level of training, experience and quality outcomes measurements, (b) the provider's market share, (c) patient acuity, (d) the provider's teaching status, case mix and scope of services, and (e) any demonstrations of good faith efforts (or lack thereof) by the provider to enter into a network agreement with the private insurer. (Compl. ¶¶ 70-71.) The QPA is roughly the median rates that the insurer is paying in-network providers for the same services in the same geographic area. (*Id.* ¶ 65.)

It was Congress' "intent and . . . determination that the QPA, which reflects standard market rates arrived at through private contract negotiations, represents a reasonable rate for services in a vast majority of cases," and should "serve as a predominate data point for the IDR entity to consider." *See* October 20, 2021 Letter from Frank Pallone, Jr.; available at: Pallone Murray No Surprises Act IFR Comment Ltr 10.20.212.pdf. (Compl.¶ 72.)

Not less than thirty (30) business days after selection, the IDRE must choose the offer it determines "best represents the value of the qualified IDR item or service as the out-of-network rate." 45 CFR 149.510(c)(4)(ii)(A). The IDRE must "explain its determination in a written decision," including "what information the certified IDR entity determined demonstrated that the offer selected . . . is the offer that best represents the value of the . . . service, among other things. (Compl. ¶ 75.) In practice, IDREs issue decisions made by unidentified person(s) that, for the most part, contain little explanation. (*Id.* ¶ 76.)

**G. <u>Rowe Has Systematically Abused The NSA's IDR Process</u>:** Rowe engages in the fraudulent practice of "fee forgiving" by intentionally waiving and/or failing to attempt to collect the balance due from patients they treat. *Feiler v. N.J. Dental Ass'n*, 191 N.J. Super. 426, 437-39 (Sup. Ct. 1983), *aff'd,* 199 N.J. Sup 363 (App. Div. 1984); *Nutrishare, Inc. v. Conn. Gen. Life Ins. Co.*, 2024 WL 1028351, at *6 (E.D. Ca. Mar. 13, 2014); *Conn. Gen. Life Ins. Co. v. True View Surgery Center One,*

*L.P.*, 128 F. Supp. 3d 501, 506 (D. Conn. 2015). Fee forgiving drives up medical costs because, among other things, it diminishes the patient's incentive to seek treatment from in-network providers. (Compl. ¶¶ 99-100.) One of the reasons Rowe does not pursue the balance is because their billable charge is a fictitious amount they never had any intention of pursuing, let alone collecting. (*Id.* ¶ 101.)

To illustrate that Rowe's billable charge is fictitious, in 2020 and part of 2021, Rowe and Emblem entered into over one-hundred and fifty (150) SCAs in which Rowe agreed to accept $25,500 for the primary surgeon and $4,080 for the assistant surgeon for a breast reduction performed on NYC PPO Plan members. (*Id.* ¶¶ 101-102.) When no SCA was entered into, both prior to 2020 and subsequent to mid-2021, Rowe accepted the applicable out-of-network benefits in hundreds of breast reductions performed on NYC PPO Plan members. (*Id.* ¶ 105.) This all changed, however, when Rowe figured out they could misuse the NSA to fraudulently obtain completely irrational awards. (*Id.* ¶ 106.)

The NSA's IDR process is astonishingly opaque. It does not include any procedures to view, verify or rebut the opposing party's *ex parte* submission. (*Id.* ¶¶ 107-108.) There is no discovery, testimony or cross-examination, and no hearing. Although Emblem did not receive any of the information Rowe submitted to the IDREs, the awards indicate that Rowe submitted falsified, inaccurate and materially misleading information. (*Id.* ¶¶ 109-115.) To obtain even higher awards, Rowe

doubled their fictitious billable charge for the primary surgeon from $150,000 to $300,000, and increased the billable charge for the assistant surgeon from $45,000 to the same $300,000. (*Id.* ¶ 117.).

***Rowe are currently billing $600,000 and securing IDR awards totaling $440,000 for a breast reduction procedure in which the QPA is below $10,000, for which Rowe has historically been paid and accepted from $6,000 to $30,000 in hundreds of surgeries performed on NYC PPO Plan members, and which Rowe admits should cost from $15,000 to $25,000.*** (*Id.* ¶¶ 118.)

## MOTION TO DISMISS STANDARD

"When deciding a motion Rule 12(b)(6), courts 'must accept all factual allegations in the complaint as true, construe the complaint in the light favorable to the plaintiff,' and determine 'whether [the] plaintiff may be entitled to relief under any reasonable reading of the complaint.'" *Edmond v. State*, 2026 WL 194495, at *2 (D.N.J. Jan. 26, 2026) (Wigenton, U.S.D.J.); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"A defendant may move to dismiss a complaint for lack of subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1) by challenging jurisdiction facially or factually." *Lopez v. Law Offices of Faloni & Assocs., LLC*, 2017 WL 2399083, at *1 (D.N.J. June 2, 2017) (Wigenton, U.S.D.J.) (*citing Constitution Party of Pennsylvania v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014)). "A facial challenge to

subject-matter jurisdiction 'considers a claim on its face and asserts that it is insufficient to invoke the subject-matter jurisdiction of the court because, for example, it does not present a question of federal law ....'" *Id*. (quoting *Aichele*, 757 F.3d at 358). "In contrast, a factual challenge 'is an argument that there is no subject matter jurisdiction because the facts of the case . . . do not support the asserted jurisdiction.'" *Id*. "Drawing this distinction is important because it 'determines how the pleading must be reviewed.'" *Id.* (*quoting Aichele*, 757 F.3d at 357–58). *See also In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012). Where, as here, a motion for lack of subject matter is made prior to the defendant's service of an answer, it is a facial challenge. *Aichele*, 757 F.3d at 358. "[A] a facial attack calls for a district court to apply the same standard of review it would use in considering a motion to dismiss under Rule 12(b)(6), i.e., construing the alleged facts in favor of the nonmoving party." *Id.*.

## I. <u>THE COURT HAS SUBJECT MATTER JURISDICTION</u>

Section (c)(5)(E)(i)(I) provides, in pertinent part, that: "A determination of a certified IDR entity . . . . (I) shall be binding upon the parties involved, ***in the absence of*** a fraudulent claim or evidence of misrepresentation of facts present to the IDR entity involved regarding such claim . . ." 42 U.S.C. § 300gg-111(c)(5)(E)(i)(I) (emphasis added). Because Section (c)(5)(E)(i)(I) expressly states that fraudulently-procured IDR awards are not binding, the First Cause of Action

seeks a declaration that the awards here are not binding on Emblem. This raises a federal question under Section (c)(5)(E)(i)(I). In the alternative, if the awards are binding, the Second Cause of Action seeks to vacate the awards pursuant to Section (c)(5)(E)(i)(II) on multiple grounds. These allegations, too, raise a federal question.

Rowe argues "[t]he [NSA] does not say that an application to vacate may be brought in a federal court" and does not create a private right. (Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint ("Moving Memo") at 8.) Rowe is conflating cases holding that there is no private right of action to ***confirm*** an IDR award (*see* Moving Memo at 9 n.6) with the causes of action here. Numerous courts have observed that Congress intentionally opted to provide a private right of action only to vacate an IDR award.

For example, in *Modern Orthopaedics of NJ v. Premera Blue Cross,* 2025 WL 3063648 (D.N.J. Nov. 3, 2025), Judge Martinotti observed that "The only role contemplated for the federal courts in the NSA is the ability to *vacate* an award" on any of the grounds set forth in Section 10(a) of the FAA. (*Id.* at *8) (emphasis added). Similarly, in *Specialtycare Inc. v. Aetna, Inc.*, 2025 WL 3719227 (M.D. Pa. Dec. 23, 2025), the Court explained: "Notably, while the NSA does not create an explicit cause of action to *confirm* an IDR award, it does create a cause of action to *vacate* one." 2025 WL 3719227, at *2 (emphasis in original). *See Neuroshield Network SE, LLC v. S&S Healthcare Strategies*, 2026 WL 743000 at *5 (N.D. Ga.

Mar. 16, 2026); *Worldwide Aircraft Servs. Inc. v. Freedom Life Ins. Co. Am.*, No. 25-cv-1158, 2025 WL 3551397, at *2 (M.D. Fla. Dec. 11, 2025). Rowe's argument that the court lacks subject matter jurisdiction is just plain wrong.

Rowe further argues that "[t]he language of [Section (c)(5)(E)(i)(II) of the NSA], instead of creating a private right of action, merely creates a procedure by which a party can make an application for a summary proceeding to vacate an arbitral award." (Moving Memo. at 8.) The two cases Rowe relies upon do not support this argument. *Teamsters Loc. 177 v. United Parcel Serv.*, 966 F.3d 245, 248 (3d Cir. 2020), did not involve vacatur of an IDR award and says nothing about whether the NSA creates a private right of action to vacate an award in federal court. The court explained there that an action to *confirm* an arbitral award would properly be brought through a summary proceeding, because there is nothing to do in such an action other than to confirm the award. *Id.* at 248. The same is not true for an action to vacate an award.

Rowe cites *Goldman v. Citigroup Glob. Market Inc.*, 834 F.3d 242, 249 (3d Cir. 2016), for the proposition that "The FAA does not itself provide a federal cause of action for vacatur of an arbitration award." (Moving Memo. at 8.) This is a strawman because Emblem is not relying upon the FAA for jurisdiction. Similarly, *Badgerow v. Walters*, 596 U.S. 1, 8 (2022), merely stands for the proposition that Section 10(a) of the FAA "do[es] not [itself] support federal jurisdiction." The First

and Second Causes of Action are, however, premised on Sections (c)(5)(E)(i)(I) and (II) of the NSA, and not on Section 10(a) of the FAA. Rowe's alternative argument, that "[t]he Declaratory Judgment Act . . . alone does not provide a court with jurisdiction," fails for the same reason. (Moving Memo. at 10 n.7.) Emblem premises jurisdiction on the NSA, and not on the Declaratory Judgment Act.

Finally, Rowe's position is irreconcilably at odds with the position they have taken in dozens of actions they have commenced in this District and other federal courts purportedly invoking federal jurisdiction to confirm IDR awards under the NSA. *See, e.g.*, Stay and Administrative Termination Order dated January 16, 2026 entered by Chief Judge Renée Marie Bumb in *In re No Surprises Act Cases*, 2:25-cv-14860 (ES) (SDA) ("*Administrative Stay Order*") at Schedule A (listing at least forty (40) cases commenced by Rowe in this District alone).

## II. <u>ROWE'S MOTION TO DISMISS COUNT I SHOULD BE DENIED</u>

Rowe's Motion does not address Count I, except to mistakenly argue that the Court lacks subject matter jurisdiction to address it. Because the Court possesses jurisdiction and Rowe makes no other argument, Rowe's motion to dismiss Count I should be denied. *See K.S.D. v. Ryan*, 2024 WL 180798, at *9 (D.N.J. Jan. 17, 2024) (denying motion to dismiss as to cause of action movant failed to address); *Jordan v. N.J. Dep. of Corrections*, 881 F. Supp. 947, 950 n.2 (D.N.J. 1995).

The foregoing aside, Section (c)(5)(E)(i)(I) explicitly provides that a determination by an IDRE "shall be binding upon the parties involved, in the absence of a fraudulent claim or evidence of misrepresentation of facts . . . to the IDR entity." It is black-letter law that a statute should not be interpreted to "render[s] an entire subparagraph meaningless." *Pulsiver v. United States*, 601 U.S. 124, 143 (2024); *see United States v. Milchin*, 128 F. 4th 199, 202 (3d Cir. 2025). "The canon again surplusage counsels . . . to give effect to every word of a statue." *Paek v. Atty Gen.*, 793 F. 3d 330, 337 (3d Cir. 2015).

If an IDR award is binding in the absence of misrepresentation of the facts to the IDRE, then it necessarily follows that an award is not binding where the facts were misrepresented. Otherwise, the language in Section (c)(5)(E)(i)(I) is meaningless surplusage, inserted by Congress for no reason and serving no purpose. Respectfully, it is not for the courts to ignore Congress' determination that awards obtained by misrepresentation of facts to an IDRE are not binding. In fact, non-binding arbitration awards are not reviewable. *See Dluhos v. Strasberg,* 321 F.3d 365, 370 (3d Cir. 2003). If an award is not binding, it has no legal force and can neither be confirmed nor vacated. *See id.; Twp. of Bordentown, NJ v. Fed. Energy Regul. Comm'n*, 903 F.3d 234, 262 n.16 (3d Cir. 2018) ("We discern no meaning to the word 'binding' other than 'having legal force to impose an obligation'") (*quoting* Black's Law Dictionary (10th ed. 2014)). The decision in *Med-Trans Corp. v. Cap.*

*Health Plan, Inc.*, 700 F. Supp. 3d 1076, 1086 (M.D. Fla. 2023), *aff'd sub nom. Reach Air Servs. LLC v. Kaiser Found. Health Plan, Inc.*, 160 F.4th 1110 (11th Cir. 2025), that Section (c)(5)(E)(i)(I) should not be applied because it "provides no information on how to bring an action . . . or what the standards would be" ignores well-settled rules of statutory construction and an entire section Congress included in the NSA. Respectfully it was wrongly decided.

Emblem argues that the awards are not binding because they were based on misrepresentation of the facts to the IDREs. (Compl. ¶¶ 377-81.) Rowe disagrees. Accordingly, Emblem properly seeks judgment declaring the awards are not binding.

Given Rowe's argument that awards procured by misrepresenting facts to an IDRE are not subject to vacatur on that ground, a determination that such awards are not binding in accordance with the unambiguous language of Section (c)(5)(E)(i)(I), is the only way to avoid opening the door to massive fraud in IDR proceedings.

## III. <u>THE SECOND CAUSE OF ACTION SHOULD NOT BE DISMISSED</u>

The sole question is whether Emblem has alleged facts that, assuming they are true, state a cause of action to vacate the awards under the NSA. The answer is a resounding yes.

### A. <u>The Complaint Alleges The Awards Are Completely Irrational</u>

Rowe's Motion fails to address that the Complaint repeatedly alleges that vacatur is warranted on the grounds that the awards are "completely irrational." In

*Swift Indus., Inc. v. Botany Indus., Inc.*, 466 F.2d 1125 (3d Cir. 1972), the Third Circuit held that a commercial arbitration "award may not stand if it does not meet the test of fundamental rationality." (*Id* at 1131.) Discussing their decision in *Ludwig Hanold Mfg. Co. v. Fletcher*, 405 F. 2d 1123 (3d Cir. 1969), the Court held that (*Swift Indus.*, 466 F.2d at 1331):

> *Honold* has, in addition to limiting the arbitrator's authority to fashion relief, also established that an award may not stand if it does not meet the test of fundamental rationality. The New York Court of Appeals, whose opinions are the source of much instruction in this field, has held that an award of an arbitrator is not subject to judicial revision unless it is "completely irrational," Lentine v. Fundaro, 29 N.Y.2d 382, 328 N.Y.S.2d 418, 278 N.E.2d 633 (1972). We consider this formulation to be a fair rendering of *Honold.* In any event, it is an accurate statement of the law.

Affirming the district court's vacatur of the arbitrator's award, which provided for payment of $6 million cash or a surety bond, the Third Circuit held the award was "completely irrational because a $6 million cash bond could not be deemed rational in view of Botany's maximum $1.5 million liability. (*Id.* at 1134.) *See Verizon Pennsylvania, LLC v. Commc'ns Workers of Am., AFL-CIO, Loc 13000*, 13 F.4th 300 (3d Cir. 2021) (vacating award as irrational); *PMA Cap. Ins. Co. v. Platinum Underwriters Bermuda, Ltd.*, 659 F. Supp. 2d 631, 638-39 (E.D. Pa. 2009) (citing *Swift* and vacating award pursuant to Section 10(a)(4) of the FAA where it was completely irrational.)

The words in *Swift* could have been written for this action. An award of $440,000 does not meet the test of fundamental rationality. Indeed, an award of $440,000 for a $15,000 to $25,000 procedure is less rational than a $6 million bond for a $1.5 million liability. The amount awarded is approximately 1,760% to 3,000% of the amount Rowe admits the procedure costs. The awards wildly exceed the cost of a breast reduction throughout the United States, including in New York and New Jersey. (*See* the accompanying Declaration of Dr. Arthur Perry dated June 18, 2026.)

The NYC PPO Plan provides coverage to hundreds of thousands of New York City employees and retirees, at affordable premiums that are largely based upon the cost of healthcare provided to NYC PPO Plan members. If completely irrational awards cannot be reviewed by a Federal court, there is nothing to prevent Rowe and other out-of-network providers from continuing to fraudulently procure wildly irrational awards. The increased costs of these awards will be borne by the very people the NSA was supposed to protect, NYC PPO Plan members.

### B. <u>The Awards Violate Public Policy</u>

A court may also vacate an arbitration award that violates a "well defined and dominant" public policy, ascertained "by reference to the laws and legal precedents and not from general consideration of supposed public interests." *W.R. Grace & Co. v. Loc. Union 759, Int'l. Union of United Rubber, Cork, Linoleum & Plastic Workers of Am.,* 461 U.S. 757 (1983). In *Stroehmann Bakeries, Inc. v. Loc. 776, Int'l. Bhd.*

*of Teamsters*, 969 F. 2d 1436 (3d Cir. 1992), the Third Circuit affirmed the district court's vacatur of an award reinstating an employee accused of sexual harassment without a determination as to whether or not the harassment had actually occurred. The award was vacated because it conflicted with the public policy against workplace sexual harassment, as expressed in Title VII and related legal precedents. *Id.* at 1441-42. *See Welch Foods, Inc. v. Gen. Teamsters, Loc. Union No. 397*, 2025 WL 1912352 (3d Cir. July 11, 2025); *Exxon Shipping Co. v. Exxon Seamen's Union*, 11 F. 3d 1189 (3d Cir. 1993).

In enacting the NSA, Congress expressed the strong public policy that the statute and IDR process were being adopted to decrease the cost of healthcare services provided by out-of-network providers. *See T.V. Seshan, M.D., PC v. Aetna, Inc.*, 2026 WL 867151, *1 (S.D.N.Y. Mar. 20, 2026) (noting that the NSA "set out accomplishing twin aims: protecting patients from unexpected, financially ruinous medical bills, and curtailing the rising costs of out-of-network treatment") (citing Letter from Frank Pallone and Patty Murray to Departments). The awards here do just the opposite. If Rowe were paid $440,000 for every breast reduction they perform, we conservatively estimate that the annual cost would exceed $120 million. (Compl. ¶ 14.) These elective procedures were prescheduled months in advance at an in-network hospital so Rowe could mislead an IDRE to award an irrational fee that bears no relationship to the cost or value of the services provided – something

the courts had refused to do in hundreds of unsuccessful actions Rowe filed. This flies-in-the face of the very policy that led to passage of the NSA.

**C. <u>The Awards Were Procured By Fraud</u>**

The Complaint alleges in detail the numerous misrepresentations Rowe made to the IDREs, including that: (i) Rowe was the "only physician" in his "small private practice" (Compl. ¶ 143); (ii) Emblem had refused to enter into Single Case Agreements (*Id.* ¶ 152) ; (iii) Emblem had refused to engage in good faith efforts to negotiate a settlement (*Id.*); (iv) Rowe had "completed extensive research, numerous publications, and presentations" (*Id.* ¶¶ 154, 217); (v) Rowe had attempted in good faith to negotiate an agreement to become an in-network provider with Emblem (*Id.* ¶¶ 156, 185); (vi) Rowe's services were "unique" (*Id.* ¶¶ 182, 186, 219, 245); (vii) Rowe's contractual history with Emblem, including the previous 4 plan years, showed that the rate of payment he had received was "closer to [Rowe's] offer in this case" (*Id.* ¶¶ 242-243, 280-81); and (viii) Rowe's billable charge was from $194,628 to $300,000 for the primary surgeon, and the same amount for the assistant surgeon. (*Id.* ¶¶ 238, 255, 318). None of these representations were true. (*Id.* ¶¶ 144-57; 185-88; 216-21; 242-51; 281-86; 344-54.)

Rowe argues that Emblem cannot allege fraud with particularity because "it has never actually seen" what they submitted to the IDRE on an *ex parte* basis. (Moving Memo. at 13.) This argument fails. First, the IDREs indicated they were

relying on specific factual representations made by Rowe that were patently false and misleading. Second, where the factual information concerning the misrepresentations "is peculiarly within the defendant's knowledge or control," the requirements of Rule 9(b) are relaxed. *In re Rockefeller Propes. Inc. Sec. Litig.*, 311 F. 3d 198, 216 (3d Cir. 2002); *see Nype v. Sam*, 2024 WL 129803 (D.N.J. Jan. 11, 2014). Courts should apply Rule 9(b) "with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants." *Gelis v. Bayerische Motoren Werke Aktiengesellschaft* 2018 WL 6804506 at *2 (D.N.J. Oct. 30, 2018). "The central inquiry . . .is whether the complaint is sufficiently precise to place the defendant on notice." *Kaiser Found. Health Plan, Inc. v. Medquist, Inc.*, 2009 WL 961426 at *6 (D.N.J. Apr. 8, 2009).

The Complaint's allegations clearly put Rowe on notice. Indeed, Rowe does not argue otherwise. If Rowe were right that Emblem cannot satisfy Rule 9(b) by alleging the fraudulent misrepresentations recited by the IDREs in their decisions, then no party could ever challenge an IDR award on grounds of fraud because the submissions to the IDRE are *ex parte*.

Rowe incorrectly argues that Emblem could have raised the allegations of fraud during the IDR proceedings. (Moving Memo at 11.) Stated otherwise, Rowe accuses Emblem on the one hand of alleging fraud "entirely on supposition" . . . "based on submissions that it has never actually seen" (Moving Memo at 13), and

then argues on the other hand that Emblem actually knew all about the fraud and could have raised it in the IDR proceeding. The court should not countenance this "heads I win, tails you lose" argument.

Rowe also argues that "bad faith . . .such as bribery, undisclosed bias of an arbitrator, or willfully destroying or withholding evidence" must be alleged to vacate an IDR award under the NSA, and that defrauding the IDRE is not sufficient. (Moving Memo at 14.) As discussed above, this argument reads Section (c)(5)(E)(i)(I) out of the NSA. Further, the Complaint does plead bath faith, including that Rowe both misrepresented the facts to the IDREs and withheld evidence. To the extent Rowe argues they were free to lie to the IDRE's, or withhold important information, they are wrong. The parties to an IDR proceeding must certify that the information they submit is accurate, true, and not false or fraudulent. *See* http://nsa-idr.cms.gov/paymentdisputes/s/. Lying under oath or knowingly concealing evidence constitutes fraud under Section 10(a)(1) of the FAA. *France v. Bernstein*, 43 F.4th 367, 378 (3d Cir. 2022).

The decisions Rowe relies upon are inapposite. *Guardian Flight, L.L.C. v. Med. Evaluators of Tex., ASO, L.L.C.*, 140 F.4th 613 (5th Cir. 2025), did not address and is inconsistent with Third Circuit precedent recognizing that an award can be vacated under the NSA where it is entirely irrational and violates public policy. Furthermore, *Guardian Flight* read NSA Section (c)(5)(E)(i)(I) entirely out

of the statute altogether. The two district court decisions Rowe cites also did not address whether an IDR award could be vacated because it was completely irrational or violated public policy, or whether an award that was based on misrepresentation of the facts to an IDRE was, for those reasons, not binding or subject to vacatur. The decision in *Anthem Blue Cross & Heath Ins. Co. v. HaloMD LLC*, 2026 WL 982629 (C.D. Cal. Apr. 9, 2026), focused almost entirely on whether the court could review determinations made by IDREs on whether a dispute was eligible for inclusion in the IDR process, which is not the issue here. (*Id.* at *8.) In *Aetna Health, Inc. v. Radiology Partners, Inc.*, 2026 WL 155164, at *3 (M.D. Fla. Apr. 15, 2026),"[w]hile a close call," the court found that Aetna failed to allege a sufficient basis to challenge IDR awards that "were wrongfully submitted by in-network providers" because Aetna admittedly knew the defendants were engaged in those very actions long before the IDR proceedings were filed but failed to raise it in the IDR proceedings.

**D. <u>The Complaint Is Not Procedurally Defective</u>**

Relying solely on *GPS of New Jersey MD P.C. v. Aetna, Inc.*, 2024 WL 414042 (D.N.J. Feb. 5, 2024), Rowe argues vacatur cannot be sought by filing a Complaint. The court in *GPS* stated "that in seeking to vacate the arbitration award entered by MCM, 'Plaintiff should have proceeded by filing *either* (i) a petition to vacate the arbitration award in lieu of a complaint, or (ii) a complaint followed by a motion to vacate the arbitration award.'" *Id.* at *2. Regardless, the *GPS* court further held that

"the Third Circuit has indicated that a district court has the discretion to construe a plaintiff's complaint as a motion to vacate the arbitration award. *Id.* (citing *Oberwager v. McKechie, Ltd.*, 351 F. App'x 708, 709 n.2 (3d Cir. 2009). If necessary, the court can do so here.

Rowe conveniently ignores that the NSA incorporates only Section 10 of the FAA, but not the procedural requirements in Sections 6 and 9, including that vacatur must be sought by motion. *See Med-Trans Corp.*, 700 F. Supp. 3d at 1084 (holding that the FAA's procedural requirements do not apply to challenging an IDR award under the NSA; (*see* Compl. ¶ 390). Notably, in the two decisions discussed above, the courts did not hold the actions were procedurally defective because plaintiffs had filed complaints seeking to vacate NSA awards in each action. Here, Emblem properly filed a Complaint and fully intends to make a motion to vacate the awards after it has obtained discovery, including Rowe's submissions to the IDRE.

**E. <u>The Noerr-Pennington Doctrine Does Not Apply</u>**

Rowe cites no decision applying the doctrine to the NSA and we are aware of none. Given that the NSA explicitly provides that IDR awards may be vacated on various grounds, Congress quite obviously did not intend to immunize IDR awards under the Noerr-Pennington doctrine.

Even if the *Noerr-Pennington* doctrine had any applicability, it would not immunize Rowe against fraud. *See Amphastar Pharms. Inc. v. Momenta Pharms.*,

Inc., 850 F.3d 52, 56 (1st Cir. 2017) (internal quotation marks, citation, and alteration omitted.)) The Third Circuit has noted that "a *material* misrepresentation that affects the very core of a litigant's . . . case will preclude *Noerr–Pennington* immunity." *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 123-24 (3d Cir. 1999) (emphasis in original). *See also U.S. Futures Exch., L.L.C. v. Bd. of Trade of the City of Chi., Inc.*, 953 F.3d 955, 960 (7th Cir. 2020). At the very least, "[D]istrict courts within this Circuit have routinely prohibited parties from invoking the protections of *Noerr-Pennington* at the dismissal stage of a case . . . at which time the factual record remains undeveloped and insufficient . . . ." *Takeda Pharm. Co. Ltd. v. Zydus Pharm. (USA) Inc.*, 358 F. Supp. 3d 389, 394-95 (D.N.J. 2018) (emphasis in original). *See Am.. Specialty Health Grp., Inc. v. Ass'n of N.J. Chiropractors, Inc.*, 2021 WL 12101070, at *3 (D.N.J. Jan. 22, 2021).

**F. <u>The Complaint Is Not Subject To Dismissal As A Group Pleading</u>**

Where, as here, "'entities are intertwined through a complex corporate structure[,] [p]laintiffs cannot be expected to know the exact corporate structure and degree of each [d]efendant's involvement at th[e motion to dismiss stage] and prior to discovery." *McMahon v. Volkswagen Aktiengesellchaft*, 2023 WL 4045156, at *10 (D.N.J. Jun. 16, 2023) (quoting *In re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160, at *9 (D.N.J. May 8, 2017)). "This exception relaxes the level of specificity required in a complaint under Rule 8 and Rule 9(b)." *Id.*; *see Yu-*

*Chin Chang v. Upright Fin. Corp.*, 2020 WL 473649, at *3 (D.N.J. Jan. 28, 2020). Dr. Rowe knows exactly what role he and the other Defendants played in the wrongdoing alleged in the Complaint. None of them has any basis on which they could "claim[] to be in the dark about the actions of the other Defendants." *McMahon*, 2023 WL. 4045156, at *10.

The cases Rowe relies upon do not support dismissal. In *JD Glob. Sales, Inc. v. Jem D Int'l Partners, LP*, 2023 WL 4558885 (D.N.J. July 17, 2023), the court found the complaint was an impermissible group pleading because "the lack of well-pleaded facts does not allow the Court to 'draw the reasonable inference that [each] defendant is liable for the misconduct alleged' and because the complaint "forc[ed] both the [d]efendants and the court to guess who did what to whom and when." *Id.* at *7. The same cannot be said of the Complaint here, which is more than "sufficient to put Defendants on notice as to the claims against them." *Id*. *Bussinelli v. Twp. Of Mahwah*, 2024 WL 3755914 (D.N.J. Aug. 12, 2024), and *Galicki v. New Jersey*, 2015 WL 3970297 (D.N.J. June 29, 2015), are equally inapposite. In both cases, unlike here, an entity defendant was lumped together with a group of *individual defendants*. In *Bussinelli*, "[t]he [c]omplaint repeatedly ma[de] legal conclusions regarding the involvement of these [individual d]efendants without specifying facts as to the particular misconduct alleged or their specific role in the alleged misconduct." 2024 WL 3755914, at *4. Such a pleading "fail[ed] to place individual

defendants on notice of the particular claims against them." *Id*. Likewise, in *Galicki*, the complaint "fail[ed] to allege the personal involvement of any [individual d]efendant as is required." 2015 WL 3970297, at *2. Here, by contrast, the Defendants are all entities under the common ownership, control and direction of the sole individual defendant, Dr. Rowe.[4]

## IV. THE MOTION TO DISMISS COUNTS III–VI SHOULD BE DENIED

### A. Plaintiff's State Law Claims Are Not Preempted By The NSA

Rowe does not cite any decision from this Circuit in which a court has held that the NSA's statutory grounds to vacate an IDR award preempt state law causes of action seeking relief other than vacatur. Although the Third Circuit has not yet spoken on the preemption issue, Judge Martinotti has opined that:

> For federal law to preempt state law, there must be a specific "[c]onflict ... where compliance with both [federal and state law] ... is a physical impossibility," or Congress must have "intended federal law to occupy the field ... [with t]he intent to displace state law altogether." Far from expressing preclusive intent, the NSA's preemption clause is clear: "[The NSA] shall not be construed to supersede any provision of State law which establishes, implements, or continues in effect any standard or requirement solely relating to health insurance issuers in

[4] Rowe half-heartedly argues Emblem lacks standing. While conceding the Complaint satisfies two of the three requirements to plead standing (*i.e.*, Emblem suffered an injury-in-fact and the relief sought will redress that harm), Rowe argues the Complaint fails to plead a "connection between the asserted injury-in-fact and the alleged actions of the defendant " (Moving Memo at 24.) This argument has no merit. The Complaint pleads a direct and logical causal connection between Rowe's fraudulent scheme and irrational IDR awards that the fraud was intended to and, in fact did, produce. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

> connection with individual or group health insurance coverage except to the extent that such standard or requirement prevents the application of a requirement of [the NSA.]"

*Modern Orthopaedics of NJ v. Premera Blue Cross*, 2025 WL 3063648, at *11-12 (D.N.J. Nov. 3, 2025) (quoting *Lozano v. City of Hazleton*, 724 F.3d 297, 303 (3d Cir. 2013)). Similarly, in *SpecialtyCare Inc. v. Aetna, Inc.*, 2025 WL 3719227, at *3 (M.D. Pa. Dec. 23, 2025), while declining to "reach the question as to whether Plaintiffs' state law claims are preempted," the Court expressed skepticism: "With respect to the NSA, rather than preempt state action, *Congress explicitly included states as part of the statutory design*. . . . [and] *wanted states to continue to play a role in regulating the health insurance marketplace*." 2025 WL 3719227, at *3 (emphasis added).

Rowe cites nothing in the NSA suggesting that Congress intended to preempt a New Jersey statute, like the Insurance Fraud Prevention Act ("NJIFPA"), that is designed to curb fraud in the insurance marketplace, or common law remedies against providers who engage in wrongdoing, especially outside the IDR process. There is a presumption that Congress does not generally intend to displace state law unless it expressly makes clear its intention to do so in the federal statute at issue. *See Maryland v. Louisiana*, 451 U.S. 725, 746 (1981).

The relief that Emblem seeks in connection with the NJIFPA, fraud, negligent misrepresentation and unjust enrichment claims is not to challenge the awards at

issue; that relief is sought only in connection with the First and Second Causes of Action. These state law claims are not "competing" with the NSA, they seek different relief altogether (*i.e.,* compensatory and punitive damages) based, in part, on Rowe's submission of claims to Emblem outside the NSA process.

Defendants rely on a *single* unpublished decision from the Middle District of Florida. *See Aetna Health Inc. v. Radiology Partners, Inc.*, 24-cv-1343-BJD-LLL, Order dated April 16, 2026 (Docket No. 105). Notably, neither of the decisions cited in *Aetna Health* holds the NSA preempts state law claims. The court's conclusion in *Reach Air Med. Servs.*, 160 F.4th at 1115, that "[n]othing in the [NSA] . . . has altered [the] limited scope of judicial review" under the FAA says nothing about the NSA preempting a state law claim that does not seek to vacate an IDR award. And, *Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530, 533 (2012), merely says the *FAA* preempts state statutes that "frustrate its purpose."

**B. The Complaint Adequately Alleges A Cause Of Action For <u>Violation Of The New Jersey Insurance Fraud Prevention Act</u>**

A violation of the NJIFPA occurs when a person or entity "[p]resents or causes to be presented any written or oral statement as part of, or in support of . . ., a claim for payment or other benefit pursuant to an insurance policy . . . knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim." N.J.S.A. 17:33A-4(a)(1). "Unlike common law fraud, proof of fraud under the [NJIFPA] does not require proof of reliance on the false statement or resultant

damages ... nor proof of intent to deceive." *Horizon Blue Cross Blue Shield of N.J. v Transitions Recovery Program,,* 2015 WL 8345537 at *4 (D.N.J. Dec. 8. 2015). "Thus a claim under the NJIFPA requires much less thorough pleading than a claim for common law fraud." *Gov't Emps. Ins. Co. v. Zuberi,* 2017 WL 4790383, at *4 (D.N.J. Oct. 23, 2017). Moreover, "[courts] must construe the [NJIFPA's] provisions liberally to accomplish the Legislature's broad remedial goals." *Lincoln Na'l. Life Ins. Co. v. Schwarz,* 2010 WL 3283550, at *16 (D.N.J. Aug. 18, 2010) (quoting *Liberty Mut. Ins. Co. v. Land,* 186 N.J. 163, 892 A.2d 1240 (N.J. Sup. Ct. 2006)). Where, as here, the Complaint alleges that the Defendant "prepare[d] a writing containing materially false statements . . . in order to support [its] insurance claims," it "sufficient[ly] . . . assert[s] a claim pursuant to the NJIFPA." *Virginia Sur. Co. v. Macedo,* 2011 WL 1769858, at *16 (D.N.J. May 6, 2011).

Rowe argues the Third Cause of Action for violation of the NJIFPA fails because the amounts they billed Emblem in the claim forms they submitted were "merely the amount the provider elect[ed] to bill" and what they were paid were "the out-of-network benefit dictated by the NYC PPO Plan, not Defendants' billed charges." (Moving Memo at 25.) Rowe attempts to rewrite the Complaint to fit their Motion. The Complaint alleges that Rowe knowingly submitted fraudulent claims/claim forms to Emblem outside the IDR process. Thus, while Rowe was submitting claims representing that his billable charge "was first $150,000 and later

$300,000 for the primary surgeon, and approximately $45,000 to $300,000 for the assistant surgeon" (Compl. ¶ 409), they knew these amounts were fictitious because "[a]s a result of their practice of fee forgiving, the amount Rowe was charging their patients were significantly less than the amount Rowe was misrepresenting to Emblem was their billable charge." (*Id.* ¶ 410.) Rowe argues this is insufficient because the Complaint fails to allege "that Emblem paid any amount in reliance on them." ( Moving Memo at 25.) Rowe ignores, however, that the NJIFPA does not require proof of reliance on the false statement or resultant damages.

Relying on *Frederico v. Home Depot*, 507 F.3d 188 (3d Cir. 2007), Rowe argues the NJIFPA claim fails to provide the particularity required under Rule 9(b). *Frederico* involved a claim for common law fraud. In any event, as the court explained in *Frederico*, Rule 9(b) merely requires a plaintiff to "plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." 507 F.3d at 200. The Complaint here alleges the dates Rowe electronically filed each claim, along with the amounts claimed. The Complaint pleads facts that are more than sufficient to provide the "who, what, when, where, and how" that Rule 9(b) requires. *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1422 (3d Cir. 1997); *see also U.S. ex. rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016). The Complaint provides Rowe with the required notice and more.

## C. <u>The Cause Of Action For Unjust Enrichment Should Not Be Dismissed</u>

The Complaint plausibly alleges that, through deceptive and improper means, Rowe unjustly obtained a massive benefit at the expense of Emblem and its insureds. This is sufficient to plead a claim for unjust enrichment. *See, e.g., Gurjal v. BMW of N. Am., LLC*, 2022 WL 3646627, at *6 (D.N.J. Aug. 23, 2022); *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (N.J. 1994); *Prima v. Darden Rests., Inc.*, 78 F. Supp. 2d 337, 355 (D.N.J. 2000); Pontrelli *v. MonaVie, Inc.*, 2014 WL 4105417, at *7 (D.N.J. Aug. 19, 2014).

Rowe's sole argument is that an unjust enrichment claim is "unavailable where the conduct at issue is governed by a comprehensive statutory scheme providing an adequate legal remedy." (Moving Memo at 26.) This argument ignores that Rowe has moved to dismiss the statutory claims it argues provide an adequate legal remedy. If this Court (contrary to the arguments set forth above) were to find that the IDR awards are binding and *not* subject to vacatur, this alternative cause of action for unjust enrichment should not be dismissed because the NSA obviously does *not* provide an adequate legal remedy.

Rowe argues that *Est. of Gleiberman v. Hartford Life Ins. Co.*, 94 F. App'x 944, 947 (3d Cir. 2004), supports dismissal because the unjust enrichment claim is "impermissibly duplicative" of Emblem's statutory and declaratory claims under the NSA and for common law fraud. In *Estate of Gleiberman*, because "the contract

[wa]s valid and enforceable, the District Court correctly dismissed the claims for unjust enrichment . . . .” noting that such a claim is “only supportable when the parties’ rights are not governed by a valid, enforceable contract.” 94 F. App’x at 947. There is no contract between Emblem and Rowe.

### D. The Fifth And Sixth Causes Of Action For Fraud And Negligent Misrepresentation Should Not Be Dismissed

The only arguments advanced by Rowe in support of dismissal of the fraud and negligent misrepresentation claims are that: (a) the claims are supposedly not pled with sufficient particularity; and (b) the Complaint allegedly fails to allege Emblem’s reliance. Neither argument has any merit.

For the same reasons discussed above, the Complaint satisfies Rule 9(b).[5] Although Rowe argues “the alleged misrepresentations were directed to the IDREs, not to Emblem,” each IDRE was an instrumentality through which Rowe’s fraudulent scheme was perpetrated on Emblem, the target and victim. “New Jersey does not require that a misrepresentation be made *to* plaintiff himself in order to be actionable.” *Union Trust Co. v. Md. v. Wakefern Food Corp.*, 1989 WL 120756, at *24 (D.N.J. Sept. 8, 1989) (emphasis added) (*citing Judson v. Peoples Bank & Trust*

[5] The Complaint pleads that Defendants engaged in the same fraud with respect to each of the IDR Proceedings listed in Exhibit A to the Complaint and uses five IDR Proceedings as exemplars. (Complaint ¶¶ 120, 377 – 384, 409 - 420.) Although Emblem submits there is no pleading defect, to the extent the Court determines that such details must be plead with respect to each of the IDRs in Exhibit A, Emblem should be permitted to amend and requests leave to do so.

*Co.*, 25 N.J. 17, 24–27 (1957). It suffices "that the defendant intend it to be communicated to and relied upon by plaintiff." *Parker Precision Prods. Co. v. Metro. Life Ins. Co.*, 407 F.2d 1070, 1076 (3d Cir.1969). *See also Metric Inv., Inc. v. Patterson*, 101 N.J. Super. 301, 309 (App. Div.1968) (emphasis added). That is precisely what the Complaint alleges here. As the Supreme Court noted, "under the common law[,] a fraud may be established when the defendant has made use of a third party to reach the target of the fraud." *Tanner v. U.S.*, 483 U.S. 107, 129 (1987).

Finally, whether Emblem reasonably relied is a question of fact that is unsuited for resolution on a motion to dismiss. *See Thomas v. Williams*, 2024 WL 2795895, at *2 (D.N.J. May 31, 2024); *Yanes v. Minute Maid Co.*, 2006 WL 1207992, at *5 (D.N.J. May 3, 2006); *Union Trust*, 1989 WL 120756, at * 25.

**E. Dr. Rowe Is Properly Named As A Defendant**

As "the New Jersey Supreme Court held: . . . 'a corporate officer can be held personally liable for a tort committed by the corporation when he or she is sufficiently involved in the commission of the tort.'" *Kenney v. M2 Worldwide, LLC*, 2013 WL 3508564, at *1 (D.N.J. Jul. 11. 2013) (quoting *Saltiel v. GSI Consultants, Inc.*, 170 N.J. 297, 303 (2002)). *See also Adam v. Barone*, 2023 WL 3058724, at *3 (D.N.J. Apr. 24, 2023). Dr. Rowe owns, controls and directs the actions of the Defendants. It was Dr. Rowe who orchestrated and directed the fraud; it was Dr. Rowe who decided to have the surgeries performed at an in-network hospital instead

of an ASC; it was Dr. Rowe who decided which practice entity would submit claims and initiate IDRs; it was Dr. Rowe who decided what Rowe's billable charge should be for each of the fraudulent claims he caused Rowe to submit to Emblem. Likewise, it was Dr. Rowe who decided what amounts to propose in Rowe's Open Negotiation Offers to Emblem, what offers to submit to the IDREs, and what information to include and misrepresent in the IDR submissions. This is more than a sufficient basis for Dr Rowe to be a party.

## V. THE REQUEST TO STAY SHOULD BE DENIED

The mere filing of a motion to dismiss does not constitute good cause to stay discovery. *Udeen v. Subaru of Am., Inc.*, 378 F. Supp. 3d 330, 332 (D.N.J. 2019) (applying four factor test); *see also Gerald Chamales Corp. v. Oki Data Ams., Inc.*, 247 F.R.D. 453, 454 (D.N.J. 2007); *United Healthcare Servs., Inc. v. Teva Pharm. USA, Inc.*, 2023 WL 6558058 (D.N.J. May 11, 2023*)*. Because "the stay of a civil proceeding constitutes 'an extraordinary remedy'", such motions are disfavored and the moving party bears the heavy burden of showing good cause for a stay. *Akishev v. Kapustin*, 23 F. Supp. 3d 440, 445 (D.N.J. 2014) (quoting *Walsh Sec. Inc. v. Cristo Prop. Mgmt, Ltd.*, F. Supp. 2d 523, 526 (D.N.J. 1998).

Rowe has not come close to meeting their burden. To the contrary, a stay would prejudice Emblem and create a tactical advantage for Rowe, who is desperate to avoid disclosure of the documents they submitted to the IDREs. Rowe has neither

argued nor established that they will be prejudiced if discovery goes forward. *Udeen*, 378 F. Supp. 3d at 333.; *see Coyle v. Hornell Brewing Co.*, 2009 WL 1652399 (D.N.J. June 9, 2009), *Landis v. N. Am. Co.*, 299 U.S. 248, (1936) *See also United Healthcare Servs., Inc.*, 2023 WL 6558058. Rowe's reliance on *Mann v. Brenner*, 375 F. App'x. 232 (3d Cir. 2010) is misplaced. In *Mann*, the Third Circuit affirmed a stay because the plaintiff's complaint was legally insufficient across all claims. That is not the case here.

## CONCLUSION

For the foregoing reasons, Rowe's Motion should in all respects be denied.

Dated: New York, New York
June 22, 2026

Respectfully submitted,

**TARTER KRINSKY DROGIN LLP**

By: _/s/ Juan Olivo-Castro_

Juan Olivo Castro
Howard S. Wolfson (*Pro Hac Vice*)
Terence K. McLaughlin (*Pro Hac Vice*)
Email: jolivo@tarterkrinsky.com
hwolfson@tarterkrinsky.com
tmclaughlin@tarterkrinsky.com

*Attorneys for the Plaintiffs*